MODERN ART PRINTING CO.

v.

SKEELS et al.

Civ. No. 286.

United States District Court,
D. New Jersey.

Aug. 3, 1954.

Harry B. Rook, Newark, N. J., for plaintiffs, Levisohn, Niner & Cohen (New York Bar), New York City, Harry Cohen, New York City.

Harry Sommers, Newark, N. J., for defendants.

MODARELLI, District Judge.

This action brought by Modern Art Printing Company, a partnership composed of Joseph Bardash and Percy Rimes, against Arthur N. Skeels and Alice M. Skeels, individually and as co-partners doing business under the firm name of Art Roll Leaf Stamping Company, seeks to enjoin an alleged infringement of Patent No. 2,491,947 applied for on June 11, 1948 by Bardash and issued to Bardash (assignor to Modern Art) on December 20, 1949. Plaintiffs also seek an accounting of profits, treble damages, costs, counsel fees, and an order for the destruction of all infringing apparatus within the control of defendants. Defendants have counterclaimed for a declaratory judgment that the patent is invalid and that they have not infringed. The parties have submitted lengthy briefs and proposed findings of fact and conclusions of law wherein four issues have been raised:

1. Whether the state of the prior art as evidenced by the (a) Correll, (b) Wickwire, and (c) Whistler Patents anticipated plaintiffs' patent;

2. Whether prior methods and machines used by (a) defendants, (b) Burndy, and (c) Weldon Roberts anticipated plaintiffs' patent;

3. Whether a license contract entered into by plaintiffs violates the anti-trust laws;

4. Whether defendants have infringed upon plaintiffs' patent.

### The Patent in Issue.

The subject of the patent is (a) a method of printing indicia upon a collapsible bottle (popularly known as a squeeze bottle) made from a flexible material, such as a plastic, and (b) the jig or fixture by means of which a printing machine may be converted to practice the method. (Page 1, col. 1, lines 1–5). The patent grant recites that "The present invention relates primarily to a meth-

od of printing indicia on the surface of an article, which is hollow and collapsible, that is one which may be caved in upon the application of force or pressure thereto, such as a bottle, particularly one having a relatively narrow neck and which bottle is made from a plastic material, such as polyethylene." The patent contains five claims, the first four of which are involved in this action.[1] In sum, the claims are that the patentee has "made it possible to print indicia on a hollow article such as a bottle, which is not rigid but which will flex and collapse under pressure by proposing a method which includes the steps of collapsing the article, supporting it in the collapsed condition, printing indicia on the collapsed and supported bottle and then releasing the bottle to enable it to return to its original shape, with the indicia printed on an exposed surface thereof * * * [and] a jig or fixture having a supporting plate and a movable pressure plate, between which plates such an article or bottle may be clamped and collapsed

---

1. 1. The method of printing on the external surface of a container having a tubular side wall, a closed bottom wall and an open neck at the top, and possessing inherent characteristics that solely maintain said container in its shape and resiliently resist deformation of said side wall, comprising the steps of placing the container between a backing member and a deforming member so that substantial end lengths of said side wall extend beyond the opposite sides, respectively, of one of said members, relatively moving said members toward each other thereby collapsing an intermediate length only of said side wall and bringing opposite wall portions thereof into parallel contacting relation with each other without substantially deforming said bottom wall and neck of the container, holding said opposite wall portions in said parallel contacting relation with each other, printing on the outer surface of one of said opposite wall portions while the latter is held in said parallel contacting relation with the other wall portion, and relatively moving said members away from each other after printing to permit said side wall to recover its normal tubular shape.

2. The method of printing on the external surface of a hollow container having a normally self-sustaining predetermined shape and having a closed bottom, an open neck and a flexible tubular wall therebetween resiliently opposing deformation, comprising the steps of placing the article in position in which said wall is disposed against backing, pressing an apertured member against an intermediate length only of said wall and thereby moving said wall length inwardly of the article toward said backing to a definite position in which the latter prevents further inward movement of said wall length, printing on said wall length exposed in the aperture of said member, while said wall length is in said definite position, and releasing said apertured member from said walls to allow the latter to regain its normal tubular shape.

3. The method of printing on the external surface of a hollow container having a normally self-sustaining predetermined shape and having a closed bottom, an open neck and a flexible tubular wall therebetween resiliently opposing deformation, comprising the steps of placing the article in position in which said wall is disposed between a backing and an apertured member relatively movable toward and away from each other, relatively moving said backing and member toward each other to press opposed portions of an intermediate length only of said wall toward each other to a definite position in which said opposed wall portions are pressed against each other, printing on the opposed wall portions exposed in the aperture of said member while said wall portions are in said definite position, and relatively moving said backing and member away from each other to allow said wall to regain its normal tubular shape.

4. In apparatus for printing on a hollow container having a closed bottom, an open neck and a tubular wall therebetween resiliently resisting deformation, the combination of a support member, a frame member, means for relatively moving said members toward each other to flatten an intermediate length only of the tubular wall of an article placed therebetween, and a printing die movable against the exposed portion of the flattened article wall in said frame member, one of said members being provided with opposite recesses to clear the non-flattened end lengths of the tubular wall of a flattened article between said members.

5. The combination in printing apparatus as set forth in claim 4, further comprising spaced outwardly yielding means between which an article is with its tubular wall guided into correct position between said members.

against the supporting plate, and held there for the printing operation." (Page 2, col. 2, lines 39–54).

### Prior Art.

The Correll Patent No. 1,740,285 for "Stamping Device" filed January 23, 1928 and granted December 17, 1929 to Orville C. Correll covers a hand stamping device using a heated die and foil for printing upon a surface. The patent discloses a device in which a ribbon or tape coated with a coloring substance is mounted in position on a base plate between a surface to be printed upon and the die of the device, so that when the die is engaged with the ribbon and pressure and heat are applied, the die will effect a transfer of the coloring substance on the ribbon to the surface, thus making a permanent impression thereon.

Mr. Leo A. Kelley, defendants' expert witness, testified on cross examination that he thought that the Correll Patent was closer to the patent in suit than any other patent he examined; (Transcript, p. 693) that while the Correll Patent did not explicitly teach a mechanical device,[2]

"the very first sentence of the specification is certainly broad enough to include a mechanically operated device." (Transcript, p. 694). Kelley also testified, however, that the statement on page 3, col. 1, line 4 of the Correll Patent [3] "indicates a manual operation" (Transcript, p. 695) although he also testified that "while it is illustrated as hand-operated, it is not necessarily limited to that" (Transcript, p. 691) but that no statement in the patent teaches a mechanical device. (Transcript, p. 694). In response to a question whether the Correll Patent related to stamping on bottles, Kelley testified that "there is no mention of bottles in the Correll patent." (Transcript, p. 688).[4]

I find that the Correll Patent teaches the use of a hand stamping device utilizing a heated die and foil for stamping flat articles; that the patent does not describe a method for printing squeeze bottles, such as is set forth in the patent in suit.

The Wickwire Patent No. 1,843,377 was granted February 2, 1932.

---

2. The introductory paragraph of the Correll Patent states: "This invention relates to improvements in stamping devices of the type wherein a die is operated by a reciprocatory plunger member to print upon a surface and then restored to its normal position by said member."

3. "To secure efficient results, it is only necessary to hold the handle 25 depressed for an instant and upon release thereof the parts will return to normal * * *."

4. Kelley further testified:
"Q. Do you find the Correll patent teaches any other subject matter of the patent in suit? A. I have to give a qualified answer to that question. The device of the Correll patent, if used to hot stamp on a collapsible article, would have the following characteristics: Depending upon the stiffness of the spring as I previously referred to, the apertured member, that is, the plate at the bottom of the Correll device, would more or less collapse the article to be printed upon. If the stiffness of the spring is overcome before there is anything like a complete collapse of the article, then of course the pressure overcomes the spring and the die member comes down, passes through the opening, and it would then come in contact with the collapsed article and of course is then forced down and a print might be obtained.
"The Court: Might be is right.
"The Witness: That is correct. The reason I said 'might be' is depending upon the heated die, whether the temperature is right, whether the foil is of the proper type, and so on.
"Q. Now, you mentioned a qualification. Is that the qualification that you referred to? A. Well, the qualification really that I had uppermost in my mind is that there is no guarantee that the degree of flatness required for in the method of the patent in suit could be achieved with this device unless the springs were made sufficiently stiff, or the spring made sufficiently stiff.
"The Court: Well, I don't think you mean to imply for practical purposes that you could use that Correll device to print on collapsible bottles successfully and commercially, do you?
"The Witness: Not in this—
"The Court: Not in its present state?
"The Witness: Not in this form, that's right." (Transcript, pp. 689–690.)

The Wickwire Patent is referred to in the patent in suit:

"In this application, I have described a jig or fixture which may be combined with a conventional printing machine, examples of which are well known in the art and one of which is broadly exemplified by the printing machine illustrated in Pat. No. 1,843,377, granted February 2, 1932, to A. M. Wickwire, Jr., although it is to be understood that this reference is in no way to be construed as a limitation." (Page 2, col. 1, lines 9–17).

Mr. William F. Grupe testified for the defendants. He is vice-president of Peerless Roll Leaf Company, Union City, New Jersey, a manufacturer of hot transfer leaf and the equipment required to use it, which company is an assignee of the Wickwire Patent. His testimony as to the patent disclosure was that "It is the machine which is used for the stamping of tubing for the enclosing of cigars, and this machine imprinted brand or customer's names on these tubes and this particular patent was developed around a method for feeding and ejecting the tubes from their confining recessed guide." (Transcript, p. 370).

The Wickwire Patent, however, does not teach the Bardash method of placing the container to be printed upon between a backing member and a deforming member so that substantial end lengths of the side wall of the container extend beyond the opposite sides of one of the members, relatively moving the members toward each other thereby collapsing an intermediate length only of a side wall of the container and bringing its opposite wall portions into parallel contact.

The third patent relied on by defendants is the one issued to L. V. Whistler on January 1, 1935, No. 1,986,036. Does it teach the Bardash method? Defendants' expert, Kelley, was not of the opinion that it does, nor is this court. Not only was Kelley of the opinion that the patent did not teach a method for printing (Transcript, pp. 678–679), but he also opined that it did not teach a

method for printing on polyethylene bottles. (Transcript, p. 711). The Whistler Patent is entitled "Perforating Die and Stripping Mechanism Therefor;" it "relates to perforating dies * * * which are adjustably secured to press platens, such as the ram and bed members of a press, and in which new and novel means are provided for so securing them in any position in the areas of said platens." (Page 1, col. 1, lines 1–10). The patent describes seven objects of the invention:

1. To secure press platens in any position in the areas of the platens;

2. To strip material which has been perforated by dies, from the perforating punch;

3. Perforating punches and the means for retaining them in position;

4. A stripper element on a perforating punch spring-retained in position by a cushioning element adapted to be compressed, or more fully compressed, under operation of the press;

5. Punch elements adapted to be interchangeably secured to a press platen;

6. Stripper device detachably secured to a perforating punch, which is capable of being contracted under pressure during the perforating action of the press;

7. Punch holders applied to a platen of a press, perforating punches interchangeably securable to the punch holders, and a stripper device removably applied to the perforating punch in use.

The patent does not teach any printing method; it describes a machine for punching holes.

I cannot find that prior to plaintiffs' patent disclosures defendants successfully imprinted squeeze bottles. Defendants' testimony was uncorroborated, thus insufficient to establish prior use by defendants. Smith v. Hall, 301 U.S. 216, 222, 57 S.Ct. 711, 81 L.Ed 1049.

Does the prior use of the Burndy machine invalidate the Bardash Patent in issue? The Burndy machine was used for hot stamping vinyl tubing, a plastic,

whereby the tubing was first partially collapsed in a guide member and then a heated die pressed a printing tape through an aperture of the guide member, thereby imprinting the partially collapsed tubing; buting was passed through a member which partially collapsed the tubing and held it in position to be stamped by a hot die bearing the data to be stamped, a rolled leaf having been interposed between the die and guide opening. The machine mainly was used for branding identifying symbols on electrical circuits for industrial use; it was useful for branding certain types of tubing the circumference of which permitted insertion into the guide member of the device. The court's inspection of the collapsing device (Exhibits D-16, 17, and 18) has not persuaded it that the Burndy machine could have been used effectively to imprint collapsible bottles.

As to the Burndy machine, which has not been in use since 1949, from the testimony of Mr. Dupre,[5] who designed the machine for the Burndy Engineering Company, I find that the Burndy method did not include a total collapse of the article to be imprinted *prior* to the moment of printing which is the distinctive feature of the Bardash method and ma-chine. And there is evidence that in order to achieve a clear print, it is essential that the bottle be in its totally collapsed state prior to the impact by the printing material. (Transcript, pp. 140–141). Further, there is no evidence that the Burndy method included a device for maintaining the bottle in a collapsed condition.

The Weldon Roberts machine and method are used to hot stamp a fiber strip which is passed through a guide member which flattened and aligned the strip with a heated die member bearing the indicia to be printed. Further, a printing tape is fed between the strip and the die member. But there is unrebutted testimony by plaintiffs' expert, Felshin (Transcript, p. 837) to the effect that the machine would produce "a burn and you wouldn't get a good print," because during the operation, the descending head which presses the imprinting foil, would press "continuously against the foil and against the die so there would be a printing operation all the way down, and that is the thing that is avoided in the patent in suit because we don't want to have the print until we have flattened and we don't want to print all the way down." (Transcript, pp. 836–837).

---

5. "A. If I may explain, these guides were made to handle certain sizes of tubing. The tubing was made to fit a guide, in other words. Sometimes the tubing, although a small size, was a little tight to fit in the guide and you would have gotten some flattening. If the tubing was a little loose in the guide, you would have gotten very little flattening or none. In other words, what I am saying is that there may have been cases where there was no flattening of the tubing on the small sizes.

"Q. Is this a correct answer to the following question? I will read the question first which was propounded to you by Mr. Sommers during the taking of your deposition at Norwalk. This is on page 56 of the transcript:

"Question: What was the reduction or collapsing percentage or ratio in most of the guide members used?

"Answer: Well, it varied. On the very small sizes of tubing, the collapsing was almost negligible. But on the larger sizes it collapsed from ⅞ of an inch diameter down to possibly ⅜ of an inch. Those are approximations.

"Does your answer that I have just read correctly state the facts in regard to the collapsing percentage or ratio of the tubing in the guide members?

"A. Within the term 'approximation,' yes.

"Q. Well, we are dealing here with fractions, aren't we, Mr. Dupre? A. I believe you referred to a decimal there.

"Q. I mean fractional sizes, less than one inch. A. Oh, yes.

"Q. And it couldn't be, as an approximation, far wrong from the figures you gave, isn't that right? A. I don't know exactly how to answer you. They are approximations. I haven't sat down and studied the exact flattening for quite a few years. Speaking now from memory, three-eighths of an inch flattening from roughly seven-eighths or a little less than an inch is a reasonable amount of flattening. It might have been even a little bit further down than that." (Transcript, pp. 355–357).

■ While the absence of any instructive prior art does not mean that a patent should have been granted, the court finds that the patent is valid in that it covers a "new and useful" process and machine within the meaning of the 1952 revision of Title 35 U.S.C., 35 U.S.C.A. § 100 et seq. and the many cases prior to the effective date thereof discussing the validity of patents. Section 103 of the revision codifies decisional patent law. Stanley Works v. Rockwell Mfg. Co., 3 Cir., 203 F.2d 846.

■ The Supreme Court has said in Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 64 S.Ct. 593, 88 L. Ed. 721, that the apparent simplicity of a discovery is insufficient to negative invention. The Court said further, 321 U. S. at page 279, 64 S.Ct. at page 594:

"Viewed after the event, the means Anthony [inventors of a leak-proof dry cell for a flashlight battery] adopted seem simple and such as should have been obvious to those who worked in the field, but this is not enough to negative invention. [Citing cases.] During a period of half a century, in which the use of flashlight batteries increased enormously, and the manufacturers of flashlight cells were conscious of the defects in them, no one devised a method of curing such defects."

Moreover, there is evidence pertaining to the commercial success of the Bardash method of printing. Exhibit P-48 is a chart showing the total amount of bottles printed by plaintiffs for their various customers for the period 1948 to October 27, 1953, totaling 36,082,500 bottles; Exhibit P-8 is an article entitled "The Squeeze Bottle Boom" (in reprinted form) from the September, 1949 issue of *Modern Packaging* Magazine, wherein the problem of labeling the squeeze bottle was discussed. The author noted that, "Very successful direct printing is, however, now being done. Heat has been found to work where solvents alone will not. By a patented adaptation of the hot-die stamping method, any single color in any type of lettering or design can be applied to the surface of round or special-shape bottles and etched deeply into the plastic, so that it cannot be removed by any ordinary rubbing. Most of the packages illustrated with this article have been decorated by this method. It has been a big factor in the great forward progress which the squeeze bottle has made in the last few months." In Jungersen v. Ostby & Barton Co., 335 U.S. 560, 567, 69 S.Ct. 269, 272, 93 L.Ed. 235, the Court in discussing the probative value of commercial success, said that it "is really a makeweight where the patentability question is close." In Goodyear Co. v. Ray-O-Vac Co., supra, the court said: "These factors [including commercial success] were entitled to weight in determining whether the improvement amounted to invention and should, in a close case, tip the scales in favor of patentability." See also Joseph Bancroft & Sons Co. v. Brewster Finishing Co., Inc., D.C., 113 F.Supp. 714, 722, affirmed 3 Cir., 210 F.2d 677. The case at bar is a proper one in which to consider, as a "makeweight" on the side of invention, the commercial success of the patented process.

The Supreme Court also was confronted with the problem of a new, useful, and commercially successful invention which appeared to be but a simply devised improvement over the prior art, in the case of Diamond Rubber Co. of New York v. Consolidated Tire Co., 220 U.S. 428, 434, 435, 31 S.Ct. 444, 447, 55 L.Ed. 527:

"The tire has utility, a utility that has secured an almost universal acceptance and employment of it * * * It was certainly not an exact repetition of the prior art. It attained an end not attained by anything in the prior art, and has been accepted as the termination of the struggle for a completely successful tire. It possesses such amount of change from the prior art as to have received the approval of the Patent Office, and is entitled to the presumption of invention which attaches to a patent. Its simplicity should not blind us as

to its character. Many things, and the patent law abounds in illustrations, seem obvious after they have been done, and, 'in the light of the accomplished result,' it is often a matter of wonder how they so long 'eluded the search of the discoverer and set at defiance the speculations of inventive genius.' Pearl v. Ocean Mills, Fed.Cas.No.10,876, 11 Off.Gaz. 2. Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention."

Defendants have argued in their brief, although the issue has never been formally raised, that the patent is invalid because of a license agreement between plaintiffs and Elmer B. Mills Corporation of Chicago, Illinois, which it is said, violates the anti-trust laws by extending the patent monopoly beyond its lawful scope. Pursuant to the agreement, plaintiff granted a "nonexclusive * * * license to practice the method of said patent * * * to make and use apparatus constructed in accordance with said patent for its own use at its plant * * *" in return for royalty payments. Defendants base their argument on two paragraphs in the agreement,[6] which generally provide: (1) for the assignment to plaintiffs of any improvement patents acquired by the licensee, and (2) that the licensee will not contest the validity

of the patent nor be a party to any procedure intended to reduce the value of the patent.

■ As to paragraph 6 of the agreement, in a case upholding a similar provision in a patent license agreement, the Supreme Court held "that the inclusion in the license of the condition requiring the licensee to assign improvement patents is not *per se* illegal and unenforceable." Transparent-Wrap Mach. Corp. v. Stokes & Smith Co., 329 U.S. 637, 648, 67 S.Ct. 610, 616, 91 L.Ed. 563. Since in the case at bar there is no evidence whatsoever pertaining to the effect that that provision in the agreement has had on the printing on squeeze bottle industry, and since that provision is not per se illegal, defendants' argument is without merit.

■ As to paragraph 17 of the agreement, it cannot be construed to bind the licensee to control its business practices in any such manner as is argued by defendants. Simply stated, the meaning of the contract language is that the licensee will not be a *party to any procedure,* the object of which is to reduce the monetary value of the patent. That the parties to the agreement did not contemplate any restrictions on the licensee's general business practices is evidenced by paragraph 9 of the agreement.[7] There is no authority to support defendants' argument that the provision is per se violative of the anti-trust laws, nor does the court believe that such should be the law. No evidence is now before the court as to any harmful effect on the industry resulting from the licensee's operations under the provision.

6. "6. Any improvements made on apparatus or methods of printing which are the subject matter of this agreement, by or through the efforts of the licensee, or acquired by it, or which come under its control, during the life of this agreement shall be the property of and properly assigned to the licensor to the full extent of the interest therein of the licensee.

"17. During the life of this agreement, the licensee acknowledges the validity of United States Letters Patent 2,491,947

and agrees that it will not contest the same, or be a party, directly or indirectly, to any procedure disputing the validity or intending to impair the value of the inventions or the Letters Patent covering the same or by which the enjoyment of full revenue from said invention by the licensor may be reduced."

7. "9. The licensee shall use its best endeavors to employ to as wide an extent as its facilities permit the method of printing which is the subject matter of this agreement."

The final issue is whether defendants have infringed upon plaintiffs' patent. At the outset, if the alleged infringing machines have " 'the same purpose in the combination, and effecting that purpose in substantially the same manner, they are the equivalents of each other in that regard.' " Hookless Fastener Co. v. Lion Fastener, Inc., 3 Cir., 84 F.2d 579, 584. Thus the test of infringement is not duplication, but rather sameness of purpose and similarity of method. As to the purpose of defendants' machines, there is no doubt that it is effectively to imprint squeeze bottles; essentially, plaintiffs' method is (a) an intermediate portion of the side of the bottle is flattened, thus avoiding damage to the neck and bottom portions of the bottle; (b) the imprint occurring while the opposite walls are in flattened contact. As was demonstrated at the trial and testified to by the experts, defendants' method of printing is: (a) the actual imprint takes place at the lowermost part of the stroke (Transcript, p. 704); (b) the neck and bottom regions of the bottle are pushed down, so that when the imprint occurs, the flattened sides of the bottle are in contact. Defendants use two machines, one of which involves the use of insulation bars fixed to a plate also carrying the heated die; by a downward motion, the plate flattens the bottle and the imprinting occurs. The other machine uses a spring pressed plate to flatten the bottle. As was said in Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 41, 42, 50 S.Ct. 9, 12, 74 L. Ed. 147:

"There is a substantial identity, constituting infringement, where a device is a copy of the thing described by the patentee, 'either without variation, or with such variations as are consistent with its being in substance the same thing.' Burr v. Duryee, 1 Wall. 531, 573, 17 L.Ed. 650. Except where form is of the essence of the invention, it has little weight in the decision of such an issue; and, generally speaking, one device is an infringement of another 'if it performs substantially the same function in substantially the same way to obtain the same result. * * * Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape.' Union Paper Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935. And see Elizabeth v. Pavement Co., 97 U.S. 126, 137, 24 L.Ed. 1000. That mere colorable departures from the patented device do not avoid infringement, see McCormick v. Talcott, 20 How. 402, 405, 15 L.Ed. 930. A close copy which seeks to use the substance of the invention, and, although showing some change in form and position, uses substantially the same devices, performing precisely the same offices with no change in principle, constitutes an infringement. Ives v. Hamilton, 92 U.S. 426, 430, 23 L.Ed 494. And even where, in view of the state of the art, the invention must be restricted to the form shown and described by the patentee and cannot be extended to embrace a new form which is a substantial departure therefrom, it is nevertheless infringed by a device in which there is no substantial departure from the description in the patent, but a mere colorable departure therefrom. Compare Duff v. Sterling Pump Co., 107 U.S. 636, 639, 2 S.Ct. 487, 27 L.Ed. 517."

Applying such a test to defendants' machines and methods, I find infringement of plaintiffs' patent claims 1, 2, 3, and 4.

The question of damages has not been discussed by the parties. Prior to the effective date of the recently enacted Patent Act, the trial court had discretionary power under Rule 53 of the Federal Rules of Civil Procedure, 28 U.S.C.A., to refer the damage ques-

tion to a special master. See Sunbeam Corp. v. Civil Service Employees' Co-operative Ass'n, 3 Cir., 187 F.2d 768, 772, reversed on other grounds, 3 Cir., 192 F. 2d 572, certiorari denied 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680; Zenith Radio Corporation v. Dictograph Products Co., D.C., 6 F.R.D. 597, 599; Barron & Holtzoff, Section 1162. However, the new provision, 35 U.S.C.A. § 284, provides that "the court shall assess" damages, the words "or cause the same [damages] to be assessed, under its direction", which appeared in the superseded 35 U.S.C.A. § 70, having been omitted. There are no cases on the significance of the omission. The legislative history of the 1952 Patent Act available to the court is inconclusive as to whether the trial court should disregard the settled practice under Rule 53, although prior to the 1952 enactment the Coordinating Committee on Revision and Amendment of the Patent Laws of the National Council of Patent Law Associations recommended to a House of Representatives Subcommittee that what is now Section 284 be changed to provide not that the court award damages but simply that damages be awarded. See Hearings on H.R. 3760 before Subcommittee No. 3 of the House Committee on the Judiciary, 82d Cong. 1st Sess. As a result of the hearings and material received by the House Committee, the bill was revised and passed by the House, Section 284 not having been changed. See Report to accompany H.R. 7794, Report No. 1923 House, 82d Cong. 2d Sess., May 12, 1952. But, absent clarifying evidence, a failure by a subcommittee of the House to adopt a recommended change in a proposed bill is not sufficient indication of the intent of the legislature to enact a provision which would radically alter an established practice.

In view of the foregoing, the court concludes that it still has the power under Rule 53 to refer the issue of damages to a special master, who will be guided by 35 U.S.C.A. §§ 283–287.

The question of counsel fees and destruction of infringing apparatus will be considered later after hearing counsel of these issues.

This shall constitute findings of fact and conclusions of law, as required by Rule 52.

An order may be submitted in conformity with the opinion herein expressed.