**The STERLING VARNISH COMPANY, Plaintiff,**

**v.**

**The LOUIS ALLIS COMPANY, Defendant.**

**Civ. A. No. 5113.**

United States District Court
E. D. Wisconsin.

Nov. 7, 1956.

Fulton B. Flick, Pittsburgh, Pa., and George Wallace of Andrus & Sceales, Milwaukee, Wis., for plaintiff.

Ira Milton Jones and James R. Custin, Milwaukee, Wis., for defendant.

GRUBB, District Judge.

This is a patent action. Plaintiff alleges that defendant has infringed claims 2 and 7 of Letters Patent 2,417,538, hereinafter referred to as Letters Patent '538, which is owned by the plaintiff. The relief prayed for is permanently to restrain defendant from further infringement, to recover damages, and for costs and reasonable attorney fees.

Defendant pleads that its operations do not fall within the claims of plaintiff's patent, and alleges that Patent '538 is invalid for the following reasons: That it is double patenting; that it is indefinite; and that it is lacking in invention in view of prior art.

Defendant counterclaimed for a declaratory judgment that Letters Patent '538 is invalid, that no claim thereof is infringed by defendant, that defendant have damages on account of plaintiff's unlawful interference with defendant's business and because plaintiff's suit was brought in bad faith to harass defendant.

The following legal principles in the construction of patents will be taken into consideration by this court. The validity of a patent is presumed. That presumption is overcome only by clear and satisfactory proof. Wisconsin Alumni Research Foundation v. George A. Breon & Co., 8 Cir., 1936, 85 F.2d 166, 167. Each claim in a patent must have invention, novelty, and utility. 2 Walker on Patents, p. 1232. Each claim

must always be read and explained in connection with the specifications. This is done not to restrict invention, but to grasp for the range of equivalents. Ibid., p. 1243. Whenever possible claims are to be construed so as to cover the real invention as found. Ibid. The scope of a patent is limited to the invention described in the claims. Motion Picture Patents Co. v. Universal Film Mfg. Co., 1917, 243 U.S. 502, 510, 37 S.Ct. 416, 61 L.Ed. 871. Claims are construed to be the same if the same thing is done in substantially the same way by substantially the same means. Schreyer v. Chicago Motocoil Corp., 7 Cir., 1941, 118 F.2d 852, 857. Under the doctrine of equivalents, claims should be construed to secure to the inventor their full benefits, to the extent that they are not disclaimed. Consolidated Water Power & Paper Co. v. Kimberly-Clark Corp., D.C. Wis.1952, 107 F.Supp. 777, affirmed, 7 Cir., 1953, 204 F.2d 573.

With reference to the defense of double patenting, one must review the proceedings had in the patent office concerning two patents which were issued to one Don F. Alexander and which are now owned by plaintiff. In December of 1943, Don F. Alexander made application for a patent for Varnishing Armatures And The Like. On November 19, 1946, Letters Patent 2,411,180, hereinafter referred to as Letters Patent '180, issued with six claims.

During the pendency of Letters Patent '180, Alexander made a second application which he claimed as a continuation in part of application '180. On April 2, 1947, some four and a half months after the issuance of Letters Patent '180, Letters Patent '538 issued with seven claims.[1]

It is the claim of defendant that plaintiff has unlawfully extended the monopoly granted to him under Letters Patent '180 by patenting the same invention again under Letters Patent '538.

The law regarding double patenting has been well stated in Miller v. Eagle Mfg. Co., 1894, 151 U.S. 186, 198, 14 S.Ct. 310, 315, 38 L.Ed. 121, wherein the court stated:

> "* * * no patent can issue for an invention actually covered by a former patent, especially to the same patentee, although the terms of the claims may differ; that the second patent, although containing a broader claim, more generical in its character than the specific claims contained in the prior patent, is also void; but that where the second patent covers matter described in the prior patent, *essentially distinct and separable* from the invention covered thereby, and claims made thereunder, its validity may be sustained.
>
> "In the last class of cases it must distinctly appear that the invention covered by the later patent was a *separate invention, distinctly different and independent* from that covered by the first patent; in other words, it must be something *substantially different* from that comprehended in the first patent. It must consist in something *more than a mere distinction of the breadth or scope of the claims of each patent.* If the case comes within the first or second of the above classes, the second patent is absolutely void." (Emphasis supplied.)

It thus appears that the issue before this court regarding double patenting is whether claims 2 and 7 of Letters Patent '538 define a separate invention beyond that covered in the claims of Letters Patent '180. For purposes of comparison we must look to the claims of the patents in question.

The claims of Letters Patent '180 are as follows:

1. It is interesting to note that the evidence before the court discloses that plaintiff, as assignee, intended to abandon Alexander's first patent application in favor of the second application. Its failure to do so is not explained.

"1. That method of varnishing an armature which comprises heating the armature to a temperature at least approximately that of the boiling point of the varnish solvent, rotating the heated armature slowly through the varnish and thereby applying thereto a coating of varnish substantially free from solvent, removing the thus coated armature from said bath and rotating it slowly to cause the varnish coating in its substantial entirety to penetrate it, and then heating it to bake the varnish while continuing to rotate it.

"2. A method according to claim 4 in which the baked article while heated is again rotated in said varnish, then rotated outside of said bath, and then rotated while again baking the applied varnish.

"3. A method according to claim 1 in which the baked article while heated thereby is again rotated in said varnish, then rotated outside of the varnish bath, and then rotated while again baking the applied varnish.

"4. That method of impregnating an electrical winding with electrical varnish which comprises heating the winding to a temperature sufficient to cause evaporation of the varnish solvent from a coating of varnish applied thereto, rotating the heated winding in a bath of the varnish and thereby applying thereto a coating of varnish substantially free from solvent, and removing the thus coated winding and heating it to bake the varnish while rotating it slowly and retaining in substantial entirety the said varnish coating.

"5. That method of impregnating an electrical winding with electrical varnish which comprises rotating the winding and heating it to a temperature sufficient to evaporate the varnish solvent from a coating of the varnish applied to it, rotating the heated winding in a bath of the varnish and thereby applying thereto a coating of varnish substantially free from solvent, removing the winding from said bath and rotating it slowly to cause the varnish coating in substantial entirety to penetrate the winding, and heating the article to bake the varnish while continuing to rotate it slowly.

"6. That method of impregnating an electrical winding with electrical varnish which comprises supporting the winding for rotation, rotating the winding and heating it at least to approximately the boiling point of the varnish solvent, rotating the heated winding in a bath of the varnish and thereby applying thereto a coating of varnish substantially free from solvent, and removing the thus coated winding and heating it to bake the varnish while rotating it slowly and retaining in substantial entirety all of the varnish coating."

Two claims of Letters Patent '538 are alleged by the defendant to be extensions of the monopoly granted in Letters Patent '180. Those claims are:

"2. That method of impregnating an electrical winding for an electromagnetic machine to fill the interstices between the elements of the winding with varnish insulation comprising the steps of heating the winding to a temperature high enough to evaporate solvent from electrical varnish applied to it, contacting the heated winding with said varnish whereby, by the heat of the winding solvent is driven from the varnish as it contacts the winding and the winding receives substantially solvent-free varnish base in a heated condition in which it coats and penetrates the interstices of the winding, terminating contacting the winding with varnish while the winding is still highly heated and promptly heating the winding with its retained substantially solvent-free varnish base to drive off any residual solvent and bake the varnish

base with retention in substantial entirety of the varnish base received by the winding.

"7. That method of impregnating an electrical winding for an electromagnetic machine, to fill the interstices between the elements of the winding with varnish insulation comprising the steps of heating the winding to a temperature of about 275° to 300° F., then immersing the heated winding in a bath of electrical varnish to coat and impregnate the winding with varnish base substantially free from solvent, removing the winding from the varnish bath while the winding is at a temperature not below about 275° F., and promptly heating the thus impregnated winding to bake the varnish base with retention in substantial entirety of the varnish base applied to the winding."

Defendant's analysis of the claims of the two patents in form of charts is set forth in the footnotes.[2, 3]

2. Chart No. 1

| First Alexander Patent | Claimed Step | Second Alexander Patent |
|---|---|---|
| 1. That method of varnishing an armature which comprises | | 2. That method of impregnating an electrical winding for an electromagnetic machine to fill the interstices between the elements of the winding with varnish insulation comprising the steps of |
| *heating* the armature to a temperature at least approximately that of the boiling point of the varnish solvent, | *Heating* to the point at which solvent will be driven off. | *heating* the winding to a temperature high enough to evaporate solvent from electrical varnish applied to it, |
| *rotating* the heated armature slowly *through the varnish* and thereby applying thereto a coating of varnish substantially free from solvent, | *Dipping* in varnish. | *contacting* the heated winding *with said varnish* whereby, by the heat of the winding solvent is driven from the varnish as it contacts the winding and the winding receives substantially solvent-free varnish base in a heated condition in which it coats and penetrates the interstices of the winding, |
| *removing* the thus coated armature from said bath and *rotating* it slowly to cause the varnish coating in its substantial entirety to penetrate it, | *Withdrawing* from varnish. | *terminating* contacting the winding with varnish while the winding is still highly heated |
| and then *heating* it to bake the varnish while *continuing to rotate* it. | *Baking* | and promptly *heating* the winding with its retained substantially solvent-free varnish base to drive off any residual solvent and bake the varnish base with retention in substantial entirety of the varnish base received by the winding. |

Claims *Differ* Only in that claim 1 of First Alexander Patent calls for *rotation** during dipping, withdrawing and baking steps.

* "Rotation is acknowledged in the specification as being old in the art; that acknowledgment is at least cogent evidence that Alexander's invention does not depend upon rotation."

—P. 63, File wrapper of abandoned application for reissue of first patent, Memorandum on Behalf of Applicant.

3. See Note 3 on page 815.

Apart from mere functional statements which cannot serve to distinguish the invention, claims 2 and 7 of patent '538 differ only in two apparent respects from the claims of patent '180. The first apparent difference is found in the recital of the second step of the process in which claim 2 refers to "contacting" the winding with the varnish and claim 7 refers to "immersing" the winding in the varnish, while the corresponding recital of this step in the claims of patent '180 refers to "rotating" the winding in the varnish.

The second apparent difference is found in the recital of the third step of the process which calls for the winding as being "still highly heated" (claim 2) or "at a temperature not below 275°" (claim 7) when removed from the varnish.

As to the first of these apparent differences it appears obvious that in order to coat a winding with varnish it is essential that it be brought into contact with the varnish and that it is utterly immaterial whether that be accomplished by "rotating", "immersing", or otherwise "contacting" the one with the other. The essence of the second step of the process is the bringing of the winding and varnish together after the former has been heated as set forth in step one of the process. The claims of patent '180 so recite. The mere use of obviously alternate, immaterial and equivalent terms in claims 2 and 7 of patent '538 to describe what is in fact the same step does not render the invention separate and distinct from that covered by the claims of patent '180. The invention remains the same in so far as the first apparent difference is concerned.

As to the second apparent difference in the claims of patent '538, namely the feature of "terminating contacting the winding with varnish while the winding is still highly heated" (claim 2) or "at a temperature not below 275°" (claim 7) which plaintiff claims is critical and is

3.

Chart No. 2

| First Alexander Patent | Claimed Step | Second Alexander Patent |
|---|---|---|
| 1. That method of varnishing an armature which comprises | | 7. That method of impregnating an electrical winding for an electromagnetic machine, to fill the interstices between the elements of the winding with varnish insulation comprising the steps of |
| *heating* the armature to a temperature at least approximately that of the boiling point of the varnish solvent, | *Heating* to the point at which solvent will be driven off. | *heating* the winding to a temperature of about 275° to 300° F., |
| *rotating* the heated armature slowly *through the varnish* and thereby applying thereto a coating of varnish substantially free from solvent, | *Dipping* in varnish. | then *immersing* the heated winding *in a bath of electrical varnish* to coat and impregnate the winding with varnish base substantially free from solvent, |
| *removing* the thus coated armature from said bath and *rotating* it slowly to cause the varnish coating in its substantial entirety to penetrate it, | *Withdrawing* from varnish. | *removing* the winding from the varnish bath while the winding is at a temperature not below about 275° F., |
| and then *heating* it to bake the varnish while *continuing to rotate* it. | *Baking* | and promptly *heating* the thus impregnated winding to bake the varnish base with retention in substantial entirety of the varnish base applied to the winding. |

Claims *Differ* Only in that claim 1 of first Alexander patent calls for *rotation* during dipping, withdrawing and baking steps.

a patentable advance in the art, the question is whether these recitals distinguish the invention of the '538 patent from that of the claims of the '180 patent. The answer is evident if the expression is defined. What does "highly heated" mean?

The exchange of questions to and testimony by Charles H. Cook, president and former chief chemist of the plaintiff, (at Tr. 145–183) is to the effect that "highly heated" may be as low as 240° or 250° F. "Highly heated" implies a reference to the boiling point of the particular solvent used. Obviously, even heat to 400° F. would not be "high" if the boiling point of a particular, hypothetical solvent were 500° F., but 150° F. would be "high" if the boiling point of a particular, hypothetical solvent were 135° F. Ultimately this testimony suggests that the meaning of the expression is: That heat which is sufficiently high as to result in not more than 2 to 3 minutes of dripping in the case of smaller windings, and not above 20 minutes in the case of larger stators, after removal from the dip tank. In other words, that is "highly heated" which is so hot as to result in a good job (where there is little or no drainage after withdrawal). It is only the lower limit of what is considered "highly heated" with which this decision is concerned.

The claims in the Letters Patent '180 speak of preheat to a temperature "at least approximately that of the boiling point of the varnish solvent", and of application of this preheated winding in a bath of varnish to cause evaporation of the solvent so that the varnish is substantially solvent free. The specifications of the '180 say that the primary advantage to be gained is that "there is no appreciable drainage in the practice of this invention, and the prolonged drainage time necessary heretofore is eliminated". If lack of varnish drainage after withdrawal of the winding from the varnish bath is the test of "withdrawing while still highly heated", then it appears to the court that the claims in suit of '538 add nothing to the invention defined in the claims of Letters Patent '180. If the '180 patent is practiced as claimed and the advantages of the process are attained, then it is physically impossible that withdrawal can be at any temperature other than "high heat". If an armature is withdrawn at a temperature lower than "high heat" so much dripping will result that the '180 patent is not being practiced because the coating of varnish will not be substantially free from solvent. It is the presence of unevaporated solvent which causes the varnish to drip and drain from a withdrawn winding. If the temperature of the winding has dropped sufficiently so that it will no longer evaporate the solvent from the varnish, then the varnish coating will not be substantially solvent free when the winding is withdrawn.

[redacted] The second apparent difference is therefore likewise regarded as immaterial and failing to render the invention of claims 2 and 7 of patent '538 separate and distinct from that covered by the claims of patent '180.

> "The test of identity is whether both, when properly construed in the light of the description, define essentially the same thing. When the claims of both cover and control essentially the same subject-matter, both are for the same invention, and the later patent is void." Thomson-Houston Electric Co. v. Elmira & H. Ry. Co., 2 Cir., 71 F. 396, 405, certiorari denied 163 U.S. 685, 16 S.Ct. 1201, 41 L.Ed. 315.

[redacted] The claims being for the same invention it follows that claims 2 and 7 of patent '538 are invalid for double patenting. To hold otherwise "would operate to extend or prolong the monopoly beyond the period allowed by law." Miller v. Eagle, supra [151 U.S. 186, 14 S.Ct. 315]. Viewing the matter in retrospect it appears to the court that the claims in suit of patent '538 if allowable should have been included in the first patent either in the original grant or in a reissue thereof and not in a second patent.

[redacted] A second defense alleged by the defendant is that Letters Patent '538 is

invalid in view of the prior state of the art especially with reference to the Herold patent. The Herold patent for Improvements in the Application of Varnishes, Lacs or like Coatings to Metal Surfaces issued in Great Britain in 1930. The Herold patent discloses a process of applying to metal bodies coatings of varnishes, lacs or the like "of hardenable phenol-aldehyde artificial resins which are applied in solution and are hardened by heating, consisting in applying such coatings to the metal bodies while the latter are at a temperature above the boiling point of the solvent, solvent being thereby evaporated as the coating is applied".

The inventive concept of Herold is certainly much like the inventive concept of Letters Patent '538. Herold taught the process of heating the metal body to be coated to a temperature above the boiling point of the solvent, and applying thereto varnish while the body's temperature was above the boiling point of the solvent thereby evaporating the solvent. The specifications of the Herold patent disclose that Herold was primarily concerned with coating the surfaces of objects with varnish. Patent '538, however, deals with the problem of penetration of windings as opposed to coating merely a surface.

A most persuasive factor in differentiating Herold from Letters Patent '538 is that although Herold had been disclosed to the world for a considerable amount of time, nobody in the art thought of applying Herold's high heat principle in the field of varnishing electrical windings. The problem of excessive drippage and poor distribution of the varnish in the windings with the attendant time lag continued as a problem in the art until Alexander's patents issued. It was said in Coltman v. Colgate-Palmolive-Peet Co., 7 Cir., 1939, 104 F.2d 508, 509, 511, that:

> "* * * evidence of immediate, wide, and extensive use following the appearance of a patent may furnish invaluable evidence in cases which would otherwise be doubtful, and may well be described as more convincing and persuasive with courts than any other evidence save recognition by the trade and the payment of substantial royalties * * *."

The Supreme Court in Goodyear Tire & Rubber Co., Inc., v. Ray-O-Vac Co., 321 U.S. 275, 279, 64 S.Ct. 593, 595, 88 L.Ed. 721, commented:

> "During a period of half a century, in which the use of flash light batteries increased enormously, and the manufacturers of flash light cells were conscious of the defects in them, no one devised a method of curing such defects. Once the method was discovered it commended itself to the public as evidenced by marked commercial success. These factors were entitled to weight in determining whether the improvement amounted to invention and should, in a close case, tip the scales in favor of patentability."

The court finds that Letters Patent '538 has had considerable commercial success and that it was not anticipated by Herold.

The defendant further alleges that Letters Patent '538 is invalid for vagueness and indefiniteness. The court does not believe that the defendant has sustained its contention on this point. Claim 2 of '538 read in the light of the specification seems clear enough so that one skilled in the art of varnishing electrical windings could practice the process claimed successfully. The degree of heat necessary to achieve the desired result must of necessity vary according to the boiling point of the varnish solvent employed. But this would hardly present a problem to one skilled in the art. The relationships between temperature and solvent boiling points is clearly delineated.

Claim 7 specifies definite temperatures in practicing the claimed process. No vagueness or indefiniteness appears to the court.

The issue of infringement depends upon the question of whether

the accused method responds to the claims of the patent in suit. It is the claims of a patent that measure the invention. Estate Stove Co. v. General Motors Corporation, D.C., 1950, 92 F. Supp. 293. It is the claims of a patent that are infringible. Balaban v. Polyfoto Corporation, D.C., 1942, 47 F.Supp. 472. Infringement is a question of fact. Balaban v. Polyfoto Corporation, supra. It is well settled that the infringement question comes to a test of sameness of purpose and similarity of method. It is not precise duplication that need be found. Modern Art Printing Co. v. Skeels, D.C., 1954, 123 F.Supp. 426; reversed on the issue of validity, 3 Cir., 1955, 223 F.2d 719. Infringement is established where the accused method is substantially identical. Neither can imperfect practice of the patented process, of itself, avoid infringement. Colgate-Palmolive-Peet Co. v. Lever Bros. Co., 7 Cir., 1937, 90 F.2d 178.

The claims presently in issue are claim 2 and claim 7 of the Alexander Patent '538. The digested elements of these claims are:

Claim 2. (a) Heat winding to temperature high enough to evaporate solvent.

(b) Contact winding and varnish to apply "substantially solvent-free varnish base."

(c) Terminate contact while winding is still "highly heated".

(d) Heat to drive off any residual solvent.

(e) Bake.

Claim 7. (a) Heat winding to about 275° to 300° F.

(b) Impregnate winding with substantially solvent-free varnish.

(c) Terminate contact while winding is not below about 275° F.

(d) Bake.

Claim 7 is limited very specifically by specified temperatures, despite use of the term "about". Claim 2 revolves about the evaporation temperatures of whatever solvents are used in the varnish employed in an application. If claim 2 survives the defense of invalidity because of indefiniteness, it is entitled to be read on any method in which the heat of the preheated winding is high enough to evaporate "substantially" all the solvent, and in which the winding is withdrawn at such temperature that it is still "highly heated", and following which withdrawal the winding is further heated to drive off any "residual solvent", as well as to bake the varnish base.

While it is more properly a matter for discussion in connection with the question of the patent's validity, it is useful to discuss the limits of the claims at this point for the purpose of determining whether they are infringed or not. Two expressions particularly need explanation in this regard. They are "substantially" and "highly heated". It is not unusual to find "substantially" defined in patent cases (frequently in connection with the issue of disclosure). Robins v. Wettlaufer, 1936, 81 F.2d 882, 892, 23 C.C.P.A., Patents, 952, says,

> "'* * * the word "substantially" as used in the patents means so near * * * as to produce and maintain the economies and superiorities sought after, * * *.
> "'* * * one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result, * * *'"

The expression "highly heated" has previously been defined herein after reference to the record in this case. With this definition the testimony and exhibits may be evaluated to determine whether they establish infringement.

As to the question whether the first or second of a two-dip process is the infringing dip, it is enough to observe that the patent in suit covers only dipping. If the patent is valid, either first, second, third, or any other, accused dip upon which the claims read, is an infringement. (See Tr. 412).

Robb's measurements of various stator temperatures at the defendant's plant on October 6, 1955 are at Tr. 213. According to the Laboratory Report, plaintiff's

exhibit No. 9, all the preheat temperatures taken as samples at that time were sufficient to distill above 75% of the solvent used, with one exception, and in that case it was high enough to distill 65%–70%. By use of the same Report it is shown that of the six sample temperatures taken upon withdrawal of the stators from the varnish dip tank, all but two were high enough to distill above 50% of the solvent, and of those two, one was high enough to distill 45%–70%.

Cook's testimony at Tr. 106 is to the effect that in his opinion 257° F. is a temperature at which substantially all the solvent would be evaporated from the defendant's varnish, a sample of which was analyzed in exhibit No. 9, because at that temperature 68% of the solvent is distilled, and the remainder would be "very rapidly" distilled.

Testimony of defendant's present time-temperature cycle practice is given by Wieseman at Tr. 262, where he says that plaintiff's exhibit No. 70 represents the present cycle. This exhibit indicates that No. 204 stators are heated to temperatures as high as 330° F. before dipping. Also the charts that are defendant's exhibits No. 23 and No. 71, and particularly the part that deals with October 6–7, 1955, show oven temperatures during defendant's normal operation of between 240° F. and 330° F. as the stators pass through it for preheating.

There is evidence of the amount of dripping in defendant's usual process. Defendant's exhibits No. 57 to No. 60 are sheets from the floor under defendant's conveyor system covered by accumulated drippings. Wieseman's testimony at Tr. 264 indicates the sheets are changed "about every two weeks". Tr. 440–442 indicates that No. 57 and No. 58 were two-week sheets, No. 59 was under the conveyor an unknown amount of time, and No. 60 was used only one and one-quarter days. These sheets were at distances of from three to six minutes following the dip. Wilson's testimony at Tr. 360 indicates that present operation

is at a rate of 1,000 to 1,500 stators per day. At this rate the thousands of stators which would pass over these asbestos sheets in a two-week period would necessarily accumulate some varnish even under the patented process which contemplates "residual" solvent after preheating and dipping, and therefore some dripping. As to the three to six minute distance from the dip tank, we have only to recall that Cook's testimony was that in cases of larger stators the piece could have been withdrawn while highly heated and yet drip for as much as twenty minutes. It is exactly the defendant's contention that it processes larger stators. It is on this ground that defendant maintained the processes observed at Dumore Company, etc. were of no use to it.

It is not a well-taken criticism of this preceding recital of the evidence toward the conclusion that infringement is made out to say that it unfairly gives weight to the plaintiff's own testimony and exhibits over those of the defendant. In the first place, the court believes that the recital accurately states what the proof established. Where the opinion or explanation of the plaintiff's own process was given by the plaintiff, and cited above, that testimony was the best evidence in the record as to the matter covered by it. The peculiarity of this case is that if the evidence is consistently evaluated to give the broadest interpretation to the claims, then the plaintiff suffers a corresponding disadvantage in that the patent claims become liable to be declared invalid for lack of disclosure, vagueness, etc. These grounds of invalidity are urged by the defendant. The parties cannot be heard to say that the meaning of expressions like "substantially" and "highly heated" is broad for one purpose, and narrow for another, in the same case.

The defendant made a detailed investigation and observation of the Zanderol process at numerous plants before it instituted its present practices. One might readily conclude from all of the evidence that defendant was impressed

with the basic ideas and accomplishments of the Zanderol process and endeavored to go as close as it could toward using that practice without infringing on the patent, assuming the patent was valid. It is the court's opinion that it came too close so that it actually would be infringing the patent in suit if that patent were valid.[4]

Defendant has strongly urged the claim that plaintiff has acted in bad faith in bringing this suit. The court does not concur in such claim or assertion and finds that the suit was not brought in bad faith or for harassment and that defendant is not entitled to the penalties that defendant is asking for.

Counsel for defendant may prepare and submit proposed findings of fact and conclusions of law in conformity with this decision, first submitting the proposed findings and conclusions to counsel for the plaintiff for approval as to form only. Counsel for defendant is likewise directed to prepare proposed judgment in conformity with this decision, submitting that proposal to counsel for the plaintiff for approval as to form only.

---

4. The court has been greatly aided in analyzing the problems presented above by observing the process as practiced at defendant's plant and by observing demonstrations put on by plaintiff as to the process.