The **COLD METAL PRODUCTS COMPANY**, Plaintiff,

v.

**CRUCIBLE STEEL COMPANY OF AMERICA**, Defendant.

Civ. A. No. 1231-52.

United States District Court
D. New Jersey.

Dec. 28, 1956.

O'Mara, Schumann, Davis & Lynch, Jersey City, N. J., for plaintiff, by Edward J. O'Mara, Jersey City, N. J., Webb, Mackey & Burden, Pittsburgh, Pa., by William H. Webb, Pittsburgh, Pa., of counsel.

Pitney, Hardin & Ward, Newark, N. J., for defendant, by Frank C. O'Brien, Newark, N. J., Fish, Richardson & Neave, New York City, by Charles H. Walker, New York City, of counsel.

MODARELLI, District Judge.

This action was commenced by The Cold Metal Products Company, an Ohio corporation, against Crucible Steel Company of America, a New Jersey corporation. Plaintiff's claims are that defendant owes it money for royalties pursuant to a patents' license contract dated September 30, 1946.[1] The opinion and decisions of this court relating to several preliminary motions are reported in D.C., 126 F.Supp. 546.

The license contract dated September 30, 1946, covered Cold Metal's Re-

---

1. The contract was terminated, pursuant to its provisions, on April 1, 1953.

versing Hot Mill Patents. All of the licensed patents related to methods and equipment for rolling metal ingots such as steel, heated to an elevated temperature, into relatively wide and thin gauged strip in lengths sufficiently long to permit coiling the metal on reels during the hot rolling operation. In 1948 and early 1949, Crucible installed a hot strip mill and began commercially to operate it about April 1, 1949. From that date until November 30, 1951, Crucible paid contract royalties amounting to $655,-189.54. One of plaintiff's claims is that additional royalties amounting to $161,-668.72 are owed for that period. A second claim is that Crucible owes royalties amounting to $329,226.07 for the period from November 30, 1951, to April 1, 1953, during which period Crucible did not pay any royalties.

In addition to the license contract issue, there are patent issues. Cold Metal alleges that although the license contract has been terminated, Crucible's continued operation of its mill infringes three of Cold Metal's patents.[2] Crucible contests the validity of the three patents.

Cold Metal's Claim for Additional Royalties for the Period from April 1, 1949, to November 30, 1951.

1. Crucible computed and paid royalties on hot rolled stainless steel which it later cold rolled, by deducting from the base price of hot rolled stainless steel extra charges for annealing and pickling the hot rolled stainless steel.[3] Cold Metal's claim for additional royalties is based on the argument that Crucible should have used the "prevailing regular market price" required under Section III, Paragraph 4 of the contract but that instead Crucible deducted from that price $4\frac{1}{2}¢$ a pound because the material was annealed and pickled before being cold rolled or fabricated.[4] Crucible agrees that the prevailing regular market price controls, but it argues that such price of hot rolled stainless strip, unannealed and unpickled, intended for further reduction by cold rolling, was the base price less the established extras of $4\frac{1}{2}¢$ a pound for annealing and pickling.

■ The court concludes that Crucible's deduction was improper. The prevailing regular market price was the "base price" and that price was for the hot rolled stainless strips and coils in the annealed and pickled condition, no extra having been charged to the purchaser for those operations. It is clear from the evidence that it was the practice in the industry to sell hot rolled stainless annealed and pickled strip at the base price without any charge to the purchas-

2. The licensed patents were:

| Patentee | Number | Filed | Granted |
|---|---|---|---|
| Steckel | 1,857,670 | 6/15/27 | 5/10/32 |
| Keeney & Ferm | 1,918,968 | 1/12/28 | 7/18/33 |
| Steckel | 1,977,214 | 5/4/31 | 10/16/34 |
| Montgomery | 2,072,121 | 10/21/33 | 3/2/37 |
| Montgomery | 2,072,122 | 12/4/34 | 3/2/37 |
| Montgomery | 2,087,065 | 1/19/34 | 7/13/37 |
| Montgomery | 2,116,121 | 12/21/35 | 5/3/38 |
| Montgomery | 2,214,107 | 10/23/36 | 9/10/40 |
| Montgomery | 2,219,150 | 6/7/37 | 10/22/40 |

The alleged infringed patents are:

Montgomery 2,072,122, Claims 6, 10, 18, and 19.
Montgomery 2,087,065, Claims 1, 2, 3, 4, and 5.
Montgomery 2,214,107, Claims 4 and 6 "are invalid for lack of patentable invention" (the only patent which has not expired).

3. The parties have stipulated that the amount involved is $100,351.23.

4. Section III, Paragraph 4 of the contract does exclude from the royalty formula extras charged to the purchaser for annealing and pickling.

er of an extra for annealing and pickling.[5] The reason there was no such charge was that the hot roller manufacturers insisted on performing those operations to permit them to inspect the material before selling it and thereby avoid later rejections by purchasers.

■ 2. The second contract issue is whether Crucible should have included in its computations, scrap resulting in its Agricultural Department from manufacturing disks and plowshares.[6] In addition to Crucible's Hot Rolling Department it has an Agricultural Department where it manufactures agricultural disks and plowshares. Scrap is produced during the operations, and in computing the royalties due on the hot mill operation, Crucible excluded all that operational scrap. Crucible argues that it is required under the contract only to pay royalties on revenue-producing material. Specifically, Crucible points to Section III, Paragraph 5 of the contract, providing that royalty payments shall be made covering "salable production" which is defined as all material "shipped or used." [7]

The court concludes that the operational scrap which Crucible failed to include in its royalty computations was "used" by it within the meaning of Section III, Paragraph 5. The contract does not exclude all scrap from computations under the royalty formula; the only excluded scrap is defective material rejected by a customer or by Crucible and later used by Crucible as scrap or sold at scrap prices. The court agrees with Cold Metal's argument that it is the weight of the material used, i. e., the weight of good material transferred to and used in the Agricultural Department and the selling price of the material transferred there that is the basis for royalties.

■ 3. The third contract issue is whether Crucible should have included in its computations and paid royalties on scrap resulting from slitting in its Cold Rolling Department.[8] In computing royalties, Crucible excluded the scrap resulting from the slitting of material after it had been transferred from the Hot Rolling Department to the Cold Rolling Department. Again, Cold Metal argues the deduction was improper because royalties must be computed on the basis of the weight of the material transferred to and "used" in the Cold Rolling Department. And again, the court concludes that Crucible's deduction was improper for all the material was used by Crucible in its Cold Rolling Department.

■ 4. As to the fourth contract claim, the issue is whether scrap resulting from Crucible's inspection of cold-rolled pickled and annealed strip is includible as a royalty base.[9] Here, unlike the other so-called scrap materials, clearly the scrap is rejected by Crucible. Under Section III, Paragraph 5, such material is excluded from royalty computations.

Cold Metal's Claim for Royalties for the Period from November 30, 1951, to April 1, 1953.

■ Cold Metal's second claim is that Crucible owes royalties for the period from November 30, 1951, to April 1, 1953. Cold Metal contends that each of the Montgomery '122, '065, and '107 patents contains one or more claims covering Crucible's hot strip mill and its operation. Crucible, of course, cannot contest the validity of those patents.[10]

5. Even Mr. Glenn, Crucible's vice-president and general manager of sales, who was called as a witness by Cold Metal, testified that no extra for annealing and pickling was charged when stainless steel hot rolled strip was sold to cold rollers.

6. The parties have stipulated that the amount involved is $46,462.93.

7. As to material rejected by Crucible and later used by it for scrap, no royalty is payable and Cold Metal does not claim royalties for such material.

8. The parties have stipulated that the amount involved is $14,591.37.

9. The parties have stipulated that the amount involved is $263.19.

10. See this court's earlier opinion, D.C., 126 F.Supp. 546, and Automatic Ra-

The '122 patent relates to improvements in reversing hot mills. The pertinent claims are Nos. 6, 10, 18, and 19.[11] The improvements are directed at the difficulty in causing the material being rolled to enter the rolls properly to prevent cambered strip.[12] Also, there had been difficulty in causing the leading end of the material properly to engage the coilers within the furnaces on opposite sides of the mill and frequently the leading end of the piece was bent, making it difficult to cause the material properly to engage the coiler. The patented solution consists of side guides on both sides of the mill, operation of the guides successively to provide a parallel guiding throat on the entering side of the mill and a tapered guiding throat on the other side of the mill. The patent also provides pinch rolls for feeding the material toward the mill and, after passing through the mill, toward the coilers, between passes, whereby the strip is properly started on the coilers. The pinch rolls are automatically raised when the strip has been properly started and they are withdrawn when the material being rolled is handled back and forth through the mill in the flat without coiling between passes. (Exhibit P–3, p. 1, col. 1, line 31 through col. 2, line 6). In the patent it is pointed out that after the strip is started through the mill and into the coilers, the pinch rolls are positioned in the low-lift position on the winding and unwinding sides so that the strip is freed of any pinching action between the mill and the winding and unwinding coilers.

The '065 patent relates to a reversing type of hot mill employing both a roughing mill unit and a finishing mill. All of the claims are pertinent.[13] That patent

---

dio Manufacturing Co., Inc., v. Hazeltine Research, Inc., 1950, 339 U.S. 827, 836, 70 S.Ct. 894, 94 L.Ed. 1312; Hall Laboratories, Inc., v. National Aluminate Corporation, 3 Cir., 1955, 224 F.2d 303, 305–306.

11. "6. In a rolling mill including a pair of housings and work rolls journaled therein, pinch rolls on one side of the mill, and means for raising one of the pinch rolls through a short distance, and independent means for raising the upper pinch rolls through a greater distance.

"10. The combination with a rolling mill having a driving motor and a controller for the motor, of adjustable side guides on both sides of the mill, and means operated by said controller for shifting the guides inwardly on the entrance side of the mill and outwardly on the exit side of the mill.

"18. In a rolling mill, a pair of housings having work rolls journaled therein, pinch rolls on at least one side of the mill for engaging material being worked in the mill, means for retracting one of said pinch rolls when unused for a substantial period, and independent means for temporarily retracting one of said rolls.

"19. The combination with a rolling mill and a roll table for advancing work thereto, of pinch rolls on one side of the mill, one of said pinch rolls being retractible, and means for retracting said roll including fluid pressure-operated cylinders and pistons, one of which has a short stroke for temporarily retracting the roll and the other having a longer stroke for retracting the roll when unused for substantial periods."

12. Cambered strip has a sidewise curvature in the plane of the strip. It is an objectionable condition during the rolling operation.

13. "1. In a method of rolling metal strip, the steps consisting in supplying to a roughing mill a heated slab-like body which is too thick for coiling, rolling the body in the roughing mill until it is substantially thin enough to permit of coiling, but maintaining the thinned body in the flat state, and, in the same heat, feeding the thinned body to a reversing mill, subjecting it to successive passes therein to reduce it to a desired strip thickness, and coiling it between passes in the reversing mill.

"2. In a method of rolling metal strip, the steps consisting in supplying to a roughing mill a heated slab-like body which is too thick for coiling, rolling the body in the roughing mill until it is substantially thin enough to permit of coiling, but maintaining the thinned body in the flat state, trueing the edges in said mill, and, in the same heat, feeding the thinned body to a reversing mill, subjecting it to successive passes therein to re-

points out that for certain classes of product it is desirable to provide a finish on the hot strip superior to that which can be obtained with a mill in which the entire reduction from the slab to the thin strip is effected by the same pair of rolls. The patentee, Montgomery, proposed taking a slab after it was properly heated and subjecting it to repeated passes through a roughing mill to elongate it and then passing the material, in the same heat, to another reversing mill with heated furnaces on opposite sides and rolling the material while coiling it between passes. Montgomery also proposed trueing the edges in the roughing mill, cropping at least one end between the rolling on the roughing mill and the rolling on the finishing mill, and continuing the rolling on the roughing mill until the breakdown cools to a temperature below that at which free scale forms. According to the patentee the advantages of the patent are that a higher finish is obtained than by using one mill stand for both breakdown and finishing operations because the heavier scale is eliminated from the material before it reach-

es the rolls on which the finishing operations are performed; also the output of the finishing mill can be increased because the mill can be operated at higher speeds a greater portion of the time than when the breakdown operations are also carried out on the same mill stand.

The '107 patent is a method patent related to the '122 patent. Claim 6 is the only pertinent claim.[14] One of the principal difficulties with the earlier reversing hot mills was they were incapable of consistently rolling a breakdown without camber or longitudinal curvature, making it necessary to permit the breakdown to coil loosely on the winding reel; there was skidding or axial shifting of the turns on the coil being wound with the result that on the next pass, the back tension imparted to the breakdown by the retarding of the unwinding reel caused an edge to strike the side guides and become folded over into a double thickness. (Exhibit P–5, p. 1, col. 1, lines 12–26).

"In accordance with the present invention, however, I utilize the

---

duce it to a desired strip thickness, and coiling it between passes in the reversing mill.

"3. In a method of rolling metal strip, the steps consisting in supplying to a roughing mill a heated slab-like body which is too thick for coiling; rolling the body back and forth in the roughing mill until it is substantially thin enough to permit of coiling, but maintaining the thinned body in the flat state, and, in the same heat, feeding the thinned body to a reversing mill, subjecting it to successive passes therein to reduce it to a desired strip thickness, and coiling it between passes in the reversing mill.

"4. In a method of rolling metal strip, the steps consisting in supplying to a roughing mill a heated slab-like body which is too thick for coiling, rolling the body in the roughing mill until the body cools to a temperature below that at which free scale forms, and until it is substantially thin enough to permit of coiling, but maintaining the thinned body in the flat state, and in the same heat, feeding the thinned body to a reversing mill, subjecting it to successive passes therein to reduce it to a desired strip

thickness, and coiling it between passes in the reversing mill.

"5. In a method of rolling metal strip, the steps consisting in supplying to a roughing mill a heated slab-like body which is too thick for coiling, rolling the body in the roughing mill until it is substantially thin enough to permit of coiling, but maintaining the thinned body in the flat state, and, in the same heat, feeding the thinned body to a reversing mill after cropping at least one end of the thinned body to facilitate its entry into said reversing mill, subjecting it to successive passes therein to reduce it to a desired strip thickness, and coiling it between passes in the reversing mill."

14. "6. In a method of rolling strip, the steps including passing a breakdown, heated to plastic condition, back and forth between reducing rolls, uncoiling it on one side and coiling it on the opposite side of the rolls, passing an end of the breakdown entirely through the rolls, frictionally gripping said end to feed it back through the rolls, freeing that portion of the breakdown between the mill and the point of coiling, and tensioning such portion uniformly throughout."

pinch-rolls only while starting the leading end of a breakdown through the mill and into the coiling reel on the opposite side, the pinch rolls being thereafter retracted, freeing the strip between the mill and the reel. I then apply sufficient torque to the shaft of the winding reel to tension the portion of the breakdown between the reel and the mill. I also apply a back tension to the portion of the breakdown between the mill and the unwinding reel thereby exerting a retarding torque on the shaft of the latter. By thus tensioning the breakdown, I am able to form a tight coil on the winding reel, thus eliminating 'skidding' and preventing cambering of the product during the later rolling passes." (Exhibit P–5, p. 1, col. 1, line 47, to col. 2, line 7.)

The patentee also points out that the guides on the exit sides of the mill prevent cambering of the leading end of the breakdown until it is engaged by the pinch rolls; the pinch rolls assist in guiding the strip until it is engaged by the coiling reel; the guides will correct any incipient camber before the leading end has entered the pinch rolls and the forward tension on the strip will pull out any camber which the mill tends to produce in the breakdown after it has been started on the reel.

Crucible's mill as constructed and operated on October 16, 1951, when the Steckel '214 patent expired (the Keeney & Ferm Patent having previously expired) embodied two details of design and operation covered by claims in the Montgomery '122 and '107 patents. One of these details was the arrangement of pinch rolls on each side of the finishing stand of the hot mill in such a way that the upper roll of each set of pinch rolls could be raised by the operation of pneumatic cylinders from pinch position to either of two positions of retraction, known as the low-lift and high-lift posi-

tions;[15] the other detail was that the deflector rolls located at the entrance to each of the coiling furnaces were driven by direct connected electric motors.[16]

Crucible contends that by making two changes in the construction of the mill, it eliminated the two details covered by the license, thereby excluding all of the mill's production from the license contract. First, the short stroke cylinders which had previously enabled the upper pinch rolls to be withdrawn from the strip to the low-lift position were eliminated so that the pinch rolls thereafter could occupy only two positions: pinch or fully retracted. An entirely separate roll was added, known as the hold-down or auxiliary roll, one on each side of the mill. These rolls were actuated by wholly separate cylinders arranged so that the hold-down rolls could also be in either an up position 12 inches above the pass line or a down position about 3 inches above the pass line. The hold-down function of the supplemental rolls, Crucible contends, was neither taught nor hinted at in any of the licensed patents. This change, resulting in eliminating the formerly low-lift, high-lift position of the pinch position, was completed on October 29, 1951. The other change in the Crucible mill involved the installation of magnetic clutches in the drives of the deflector rolls. Provision was made for the rolls to be driven by their motors; this prevented them from being warped by unequal exposure to the furnace heat which would have been the result if the rolls were permitted to stand in one position for a substantial length of time. Crucible argues the only licensed patent claim relating to the driving of the deflector rolls was Claim 4 of the '107 patent which included the feature of driving the deflector rolls "to prevent frictional drag on the breakdown" during the coiling-rolling operation. But, Crucible contends, it re-arranged its deflector rolls drive in such a way that during the coiling-rolling operation the

---

15. See Claims 6, 18, and 19 of Montgomery '122.

16. See Claims 4 and 6 of Montgomery '107.

deflector rolls were disconnected from the motor drive by the operation of the newly installed magnetic clutches; the rolls were rotated during the coiling-rolling operation solely by such frictional drag as was caused by contact between the material and the surface of the roll. This, according to Crucible, was exactly the way the corresponding deflector rolls had been driven in the expired Steckel '214 patent. The installation of these magnetic clutches was completed on November 19, 1951.

The result of the installation of the magnetic clutch was that each deflector roll was driven when strip was not being rolled, but the drive was interrupted during rolling operations involving coiling so that only the strip served to drive the roll. This change, however, did not affect the operation of the mill. As to the modification of the pinch rolls the result was that the cylinder for attaining the low-lift position was hydraulically operated rather than air actuated. Here, too, however, the change made no operational difference.

Each of the specifications in Claim 6 of the Montgomery '107 patent was followed in Crucible's modified mill. The Crucible mill passes a breakdown, heated to plastic condition, back and forth between reducing rolls, uncoiling it on one side and coiling it on the opposite side of the rolls; an end of the breakdown is passed entirely through the rolls and frictionally grips the end to feed it back through the rolls; that portion of the breakdown between the mill and the point of coiling is freed; finally, that portion of the strip between the mill and the point of coiling is tensioned uniformly throughout.[17]

■ In addition to Claim 6 of Montgomery '107, the Crucible mill is covered by Claims 6, 10, 18, and 19 of the Montgomery '122 patent. As to Claim 6, Crucible's auxiliary roll is movable through a short distance to provide the low-lift position; the upper pinch roll is movable by independent means through a greater distance to provide the pinch and high-lift positions. Thus, Crucible having used the substance of that claim, its mill is covered by the claim. Graver Tank & Mfg. Co., Inc., v. Linde Air Products Co., 1950, 339 U.S. 605, 607, 608, 70 S.Ct. 854, 94 L.Ed. 1097; Kellett Autogiro Corp. v. Brohan, D.C.N.J.1938, 24 F.Supp. 81. As to Claim 10, Crucible's modified mill has a driving motor for the four-high mill and a controller for the mill motor; it also has side guides on both sides of the mill and means operated by the mill motor controller for shifting the guides inwardly on the entrance side of the mill and outwardly on the exit side of the mill. As to Claims 18 and 19, it is clear from Mr. Sachs' testimony [18] that Crucible's mill is covered by those claims.

Crucible's mill also is covered by the five claims of the Montgomery '065 patent. As to Claim 1, "a heated slab-like body which is too thick for coiling" (Transcript, p. 399) is supplied to a roughing mill; where it is rolled "until it is substantially thin enough to permit of coiling" (Transcript, pp. 400, 423–425); this is done while "maintaining the thinned body in the flat state" (Transcript, p. 400); "in the same heat" (Transcript, p. 400); the thinned body is fed to a reversing mill where it is subjected to successive passes to reduce it to the desired strip thickness and where it is coiled between passes (Transcript, pp. 400–401, 800–801). Claim 2 differs from Claim 1 only in that Claim 2 includes the step of trueing the edges of the roughing mill—and this too is done in Crucible's modified mill (Transcript, p. 401). Claim 3 differs from Claim 1 only in that Claim 3 specifically includes rolling the body back and forth in the roughing mill, which is also done in Crucible's mill. (Exhibit D–3, pp. 5–6). Claim 4 specifies that the material is rolled in the roughing mill until it cools to a temperature below that at

17. Mr. Valette, Crucible's expert, so testified.

18. Transcript, pp. 573, 574, 575.

which free scale forms; this also is done in Crucible's mill (Transcript, pp. 802–807, 814). Claim 5 differs from Claim 1 only in that Claim 5 specifies that the material is fed to the reversing mill after cropping at least one end of the thinned body to facilitate its entry into the reversing mill. And this too is part of Crucible's mill (Transcript, pp. 401, 799, 808).

Both parties have stipulated that the royalty amount in dispute for the period from November 30, 1951, to April 1, 1953, is $329,226.07, and the court finds that Crucible owes this amount to Cold Metal. The court also has decided in favor of Cold Metal on the license contract issues involving annealing and pickling ($100,351.23), the blanking of disks and plowshares ($46,462.93), and slitting scrap ($14,591.37). Thus, the total amount Crucible owes to Cold Metal is $490,631.60 plus interest.[19]

Validity of Plaintiff's Patents

[redacted] The flash of genius test has been extinguished and Cold Metal has the benefit of a presumption of validity even though this court "* * * is left to the struggle to determine upon which side of a vague boundary line it will place the alleged invention. * * *" R. M. Palmer Co. v. Luden's, Inc., 3 Cir., 1956, 236 F.2d 496, 500. The burden of establishing the invalidity of the patents rests upon Crucible. Hartford National Bank & Trust Co. v. E. F. Drew & Co., Inc., 3 Cir., 1956, 237 F.2d 594, 596. And commercial success of any disclosures in a patent is evidence of invention. Palmer v. Luden's, Inc., supra; Hartford National Bank & Trust Co. v. E. F. Drew & Co., Inc., supra.

[redacted] The Montgomery '065 patent has been held invalid by the Court of Appeals for the Sixth Circuit. Cold Metal Products Co. v. Newport Steel Corp., 6 Cir., 1955, 226 F.2d 19, 22. That court held that "In view of the then state of the art, we think that the particular mechanical arrangements disclosed by the patents in suit represented nothing more than a felicitous selection of known elements, none of which contributed in combination any new or unusual function, and that the subject matter as a whole would have been obvious at the time the claimed inventions were made to persons having ordinary skill in the art of hot rolling metals. 35 U.S.C.A. § 103." That decision, of course, is not binding upon this court, although it is entitled to great weight. Standard Brands, Inc., v. National Grain Yeast Corp., 3 Cir., 1939, 101 F.2d 814, affirmed 1939, 308 U.S. 34, 60 S.Ct. 27, 84 L.Ed. 17.

[redacted] This court having independently judged the issue of validity, finds the '065 patent invalid. The five claims of the patent all are limited to a method of rolling a heated slab-like body in a roughing mill until it is substantially thin enough to permit coiling, and then in the same heat feeding the thinned body to a reversing finishing hot mill and subjecting it to successive passes to reduce it to the desired thickness while it is being coiled between passes. All of the claims are alike except for details such as trueing the edges of the material in the roughing mill, rolling in the roughing mill until the material cools to a temperature below that at which free scale forms, and end cropping the material before passing to the finishing mill. But the idea of using a roughing mill as a prelude to finish rolling on a reversing coiling hot mill was not new to the art. See Keeney & Ferm '968 and Steckel '214. Even the Cushwa Patent No. 904,605 applied for on August 18, 1905, and issued on November 24, 1908, for a Method of Rolling Sheet Metal disclosed a multi-stand finishing mill.

[redacted] Claims 6, 10, 18, and 19 of the Montgomery '122 patent are valid. Claims 6, 18, and 19 relate to a rolling mill with pinch rolls on at least one side of the mill and mechanism for operating them for shifting into one of three po-

19. The court's decisions of the license contract issues result in a dismissal of Crucible's counterclaim for overpayments of $9,479.15 and $4,661.00.

[redacted]

sitions: pinch, low-lift, and high-lift. The Steckel '214 patent taught only the pinch and high-lift positions. These Montgomery claims added entirely new functions. For example, in the low-lift position the strip is free to enable the coilers and uncoilers to provide uniform tension on the strip. Furthermore, when the pinch rolls are in the low-lift position they hold the strip inside the side guides, preventing cambering. Additional functions are that damage to the strip is minimized as it strikes the side guides, sidewise movement of the strip is limited, and uniformity of tension is maintained. As to Claim 10, it relates to a controller for a driving motor of the rolling mill with side guides on both sides of the mill, the controller being used for shifting the guides. Crucible contends that this claim is invalid because it is completely anticipated by Steckel '214. But in that patent the side guides are moved by frictional engagement with the table rollers which are driven through shafts and gears by the rolls (the pinch rolls are driven by motors controlled separately from the mill motor). The guides disclosed by Montgomery maintain the strip in the center of the mill and on the entrance side they prevent cambering.

■ Cold Metal also complains that Claim 6 of the Montgomery '107 patent has been infringed. Crucible not only questions the validity of Claim 6 but also seeks a declaratory judgment that Claim 4 is invalid and not infringed.[20] Claim 6 is invalid. It describes a method of rolling strip by passing a heated breakdown back and forth between reducing rolls, the uncoiling and coiling occurring on opposite sides of the rolls; the end of the breakdown is frictionally gripped and fed back through the rolls and the material is uniformly tensioned. Steckel '670 provides for tensioning hot strip by means of coiling reels, and Keeney & Ferm '214 discloses tension between the mill and the coiler. Since the court finds that there is no substantial difference between Claim 4 and Claim 6, Claim 4 also is invalid.

### Infringement

There is no issue as to Crucible's infringement of the claims of plaintiff's valid Montgomery '122 patent. Crucible admits that " * * * the construction and operation of defendant's mill * * * were likewise the same during both time periods [the period of the license contract and the period after its termination].[21] Thus, it is unnecessary for the court again to discuss the construction and operation of Crucible's mill and whether it is an infringement of Cold Metal's valid patent, and the court finds that defendant has infringed upon Claims 6, 10, 18, and 19 of the Montgomery '122 patent. The issue of damages shall be referred to a Special Master who will be guided by 35 U.S.C.A. §§ 283, 287,[22] unless the parties can agree by stipulation.

The question of costs and reasonable attorneys fees to the plaintiff will be considered later after hearing counsel on these issues.

The foregoing opinion shall constitute findings of fact and conclusions of law as required by Rule 52, 28 U.S.C.A.

An order may be submitted in conformity with the opinion herein expressed.

20. "4. In a method of converting a slab or ingot into strip, the steps including passing a slab back and forth in the flat between reducing rolls to form a breakdown, passing the breakdown back and forth between reducing rolls to form a strip, winding the breakdown on a coiling reel between passes through the rolls, bending the breakdown about a guide roll, and driving said guide roll to prevent frictional drag on the breakdown."

21. Defendant's Brief after Trial, p. 11.

22. As to the court's power to refer the issue of damages to a Special Master, see Modern Art Printing Co. v. Skeels, D.C., 123 F.Supp. 426, 434, reversed on other grounds, 3 Cir., 1955, 223 F.2d 719.