247 F.2d 241
 The COLD METAL PRODUCTS COMPANY
v.
CRUCIBLE STEEL COMPANY OF AMERICA.
Appeal of The COLD METAL PRODUCTS COMPANY.
Appeal of CRUCIBLE STEEL COMPANY OF AMERICA.
 No. 12216.
 No. 12217.
 United States Court of Appeals Third Circuit.
 Argued June 14, 1957.
 Decided August 9, 1957.
 Rehearing Denied September 25, 1957.
 
 William H. Webb, Pittsburgh, Pa. (Morton Burden, Jr., Pittsburgh, Pa., Edward J. O'Mara, Jersey City, N. J., Webb, Mackey & Burden, Pittsburgh, Pa., O'Mara, Schumann, Davis & Lynch, Jersey City, N. J., on the brief), for plaintiffs-appellants.
 Charles H. Walker, New York City (Frank C. O'Brien, Pitney, Hardin & Ward, Newark, N. J., Charles E. Kenworthey, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Raymond J. McElhannon, Ward, Neal, Haselton, Orme & McElhannon, New York City, Henry J. Zafian, Ronald F. Ball, Fish, Richardson & Neave, New York City, on the brief), for defendant-appellee.
 Before MARIS, STALEY and HASTIE, Circuit Judges.
 MARIS, Circuit Judge.
 
 
 1
 These are cross appeals by the plaintiff, Cold Metal Products Company, and the defendant, Crucible Steel Company of America, from a judgment entered in the District Court for the District of New Jersey. They involve questions as to the validity of certain patents owned by Cold Metal, as to the infringement of the patents by Crucible after April 1, 1953, when a license agreement between the parties terminated, and as to Cold Metal's right to royalties from Crucible under the license agreement for the period November 20, 1951 to April 1, 1953. The patents in suit, Montgomery No. 2,072,122, Montgomery No. 2,087,065 and Montgomery No. 2,214,107, relate to improvements in apparatus and methods for rolling heated metal ingots into long thin strips in a reversing hot rolling mill.
 
 
 2
 One method of performing this operation is to use a continuous hot mill consisting of a roughing mill plus a finishing mill, the latter consisting of a number of mill stands set in a row, one after the other. In the operation of such a mill the original ingot is reduced in the roughing portion of the mill to the dimensions of a slab or "breakdown", which is then reduced to strip of the desired thickness by a single continuous pass through the row of mill stands comprising the finishing portion of the mill. The mill stands comprising the finishing portion of such a mill have conventionally been 4-high mills equipped with antifriction bearings.
 
 
 3
 The other method of performing the operation is by the use of a reversing hot mill. The roughing portion of such a mill is not different from that of a continuous mill but the finishing operation, instead of being conducted by passing the material once through a succession of mill stands as in a continuous mill, is conducted by passing the strip back and forth through a single finishing mill stand, the rolls of which are brought closer and closer together for each successive pass until the strip has been reduced to the desired thickness. The mill stand used in such a reversing hot mill ordinarily is the same sort of 4-high mill with antifriction bearings as is used in the finishing portion of a continuous mill. On each side of the finishing mill stand are a roll table over which the strip passes, a pair of pinch rolls for gripping and moving the strip, side guides for confining it in its path, a deflector to direct it into the coiler furnace, and a coiler furnace and a coiling reel therein upon which the strip is wound as it is passed through the mill and kept heated for its next pass through the mill in the reverse direction. The Steckel Patent No. 1,857,670, the Keeney & Ferm Patent No. 1,918,968 and the Steckel Patent No. 1,977,214, all owned by Cold Metal and all now expired, cover basic features of reversing hot mills such as we have described. The three subsequently issued Montgomery patents in suit cover improvements in the apparatus and process of such mills.
 
 
 4
 Reversing hot mills do not produce as fine a product as is produced by continuous mills and their productivity necessarily is not as high but they do have the advantage of costing very much less than continuous mills. This advantage apparently appealed to Crucible and on September 30, 1946 it entered into a license agreement with Cold Metal covering Cold Metal's reversing hot mill patents, including, inter alia, the six patents above mentioned. Under this license agreement Crucible installed in its plant at Midland, Pennsylvania, a reversing hot rolling mill which it began to operate commercially on April 1, 1949. Its installation comprised a single stand universal roughing mill for rough rolling ingots into rectangular slabs and into relatively long and thin breakdowns and a single stand reversing hot finishing mill for hot rolling the breakdowns into continuous strip. Roll tables were installed in advance of the universal mill, between the universal mill and the reversing mill, and extended beyond the reversing mill for conveying ingots, slabs, breakdowns and strip into, through and out of the mill.
 
 
 5
 The license agreement called for the payment of royalties at a fixed rate during the lifetime of the three dominating Steckel and Keeney & Ferm patents, the last of which expired on October 16, 1951, and at half the original rate after that date, provided that Crucible's mill was thereafter covered by any claim of any of the remaining unexpired patents included in the license. Termination of the agreement was permitted on April 1, 1953 and it was terminated by Crucible on that date. Crucible paid Cold Metal royalties amounting to $655,189.54 until November 30, 1951, but none after that date, contending that its mill, as modified in October and November, 1951 was not covered by any claim of the licensed patents which still remained unexpired.
 
 
 6
 Cold Metal brought suit on December 18, 1952 in the District Court for the District of New Jersey for royalties allegedly due under the license agreement for the use of the mill and equipment for the period November 30, 1951 to April 1, 1953 and for royalties in addition to those already paid for the period April 1, 1949 to November 30, 1951. On July 2, 1954 it instituted an action in the District Court for the Western District of Pennsylvania against Crucible for infringement of the patents here in suit subsequent to April 1, 1953, the termination date of the license agreement. Crucible filed a motion in the District Court in New Jersey for leave to file a supplemental counterclaim seeking a declaratory judgment that Cold Metal's three Montgomery patents are invalid and noninfringed and asked the court to enjoin the prosecution of the Pennsylvania patent infringement suit. Cold Metal moved, pursuant to section 1404(a) of title 28 United States Code, for an order transferring the New Jersey action to the Western District of Pennsylvania. Crucible's motions were granted and Cold Metal's motion was denied. 126 F. Supp. 546.
 
 
 7
 In its supplemental counterclaim Crucible sought a declaratory judgment that the three Montgomery patents in suit are invalid and not infringed and also asked the court to enjoin any further suits under these patents. Cold Metal, in a counterclaim annexed to its reply to Crucible's supplemental counterclaim, charged infringement of its patents by the unauthorized use by Crucible of its mill after the termination of the license agreement, for which Cold Metal sought an accounting of profits and damages. In defense to this claim Crucible attacked the validity of the patents and asserted that the alterations in its mill and in the process employed in its operation which it had made in October and November, 1951 and which were completed on November 19, 1951 had taken its mill out from under the claims of Cold Metal's unexpired patents.
 
 
 8
 Upon the trial of the present action in the District of New Jersey the district court found that Cold Metal was entitled to recover additional royalties under the license agreement for the period April 1, 1949 through November 19, 1951 and entered judgment in favor of Cold Metal in the amount of $146,210.38 together with interest amounting to $53,359.89, a total of $199,570.27. This amount was subsequently paid by Crucible and is not involved in the present appeals. The district court also found that the changes made by Crucible in its mill in October and November, 1951 did not relieve it from liability for royalties under the license agreement and that Cold Metal was entitled to royalties from November 20, 1951 to April 1, 1953, the termination date of the agreement, and entered judgment on this score in favor of Cold Metal in the amount of $334,942.07, together with interest of $88,259.24, a total of $423,201.31. Certain allowances were made to Crucible for royalty overpayments.
 
 
 9
 The district court held that claims 6, 10, 18 and 19 of Montgomery Patent No. 2,072,122 were valid and had been infringed by Crucible from April 1, 1953 to the date of the patent's expiration, March 2, 1954. The court accordingly adjudged Cold Metal to be entitled to recover damages for Crucible's infringement of that patent and referred to a master the determination of the amount of such damages. The court held that claims, 1, 2, 3, 4 and 5 of Montgomery Patent No. 2,087,065 and claims 4 and 6 of Montgomery Patent No. 2,214,107 were invalid. 147 F.Supp. 25. These cross appeals by Cold Metal and Crucible followed.
 
 
 10
 The first question for our consideration on these appeals is whether the district court erred in holding the claims in suit of Patent No. 2,072,122 valid and infringed and the claims in suit of Patents Nos. 2,087,065 and 2,214,107 invalid. In considering these questions we must bear in mind that these are not basic patents but merely claim improvements in the process and apparatus of the reversing hot rolling mill which was disclosed and the basic essentials of which were covered by the Steckel and Keeney & Ferm patents.[1] Those basic patents having expired, Crucible and all the world became free to use that mill. The three patents in suit must, therefore, disclose patentable improvements over Steckel and Keeney & Ferm in order to be valid. Moreover in order to justify a finding of infringement it must appear that these improvements on the prior art were employed in the Crucible mill after the changes therein were completed on November 19, 1951.
 
 
 11
 We consider first Montgomery Patent No. 2,072,122. Claims 6, 18 and 19 of this patent[2] relate to the pinch rolls employed in a reversing mill to engage the strip and feed it to the mill rolls or the coilers. Keeney & Ferm employed pinch rolls near the entrance to each of the coiling furnaces, which were held in engagement with the strip by adjustable springs and were provided with a motor drive to enable them to be used to feed strip toward the coiler or the mill rolls as the case might be. Their drives included magnetic clutches so that the drives would be disconnected and the rolls allowed to act as "idle guide rollers" when not required for feeding purposes. Steckel No. 1,977,214 had pinch rolls which, though originally intended to be used to apply tension to the strip as well as to feed it to the mill and coilers, were "arranged to be raised and lowered as desired". The raising and lowering was accomplished by controlling the supply of air to cylinders in which were located vertically moving pistons connected to the housing in which the pinch rolls were mounted. Since this was a single stand mill the upper limit of travel of the upper pinch roll had to be high enough to permit the passage of the thickest material to be passed through the mill.
 
 
 12
 It appears that when the raised pinch roll was dropped from such a height it came down with such force as to involve danger of marring the strip and damaging the equipment. The evidence establishes that it was to remedy this situation that the improvement of the claims now under discussion of Patent No. 2,072,122 was directed. This was to add an extra pair of cylinders of shorter stroke so that the upper pinch rolls could be raised only a short distance off the strip by using these new cylinders or the original longer distance by using the original set of cylinders. The language of claims 18 and 19 suggests that the purpose is to use the low lift cylinders for temporarily retracting the upper pinch rolls and the high lift cylinders for retracting them for longer periods. We are satisfied that these claims disclose an obvious expedient, the addition to the means employed by Steckel of another means of the same type to perform the same function of lifting the upper pinch rolls, but to a different and less elevated position. This was mere aggregation and in any event did not rise to the dignity of invention.
 
 
 13
 Cold Metal, however, argues and the district court held that the upper pinch rolls in the new low lift position perform new and useful functions not disclosed or claimed in the patent. It asserts that in this position they provide a vertical guiding action, holding the strip down inside the side guides and thereby keeping the strip under the control of the side guides and assisting in preventing cambering, they minimize damage to the strip in the event that it strikes the side guides, they provide a lateral guiding action and limit sidewise movement of the strip, they assist in maintaining uniformity of tension, they keep any looping of the strip away from the coilers, and finally they allow the strip to be raised from the table rolls and still be kept down within the side guides.
 
 
 14
 The difficulty with this argument is that this use of the upper pinch rolls in the low lift position as guide and hold-down rolls is not taught by the patent but is in fact a departure from its teachings. For the specification of the patent refers to the pinch rolls when elevated to the low lift position as being "lifted off the strip", "lifted from the material" and "lifted out of the way when there is no further need for them". It is apparent that what Cold Metal is here asserting as covered by the claims of this patent is the procedure which Crucible employed in its licensed mill, not what the patent claimed. But the fact that Crucible (prior to the changes completed on November 19, 1951) employed the upper pinch rolls in their low lift position for these purposes does not bring those functions within the scope of this patent. For as we have seen it was a departure from and not a use of the invention here claimed. Moreover the use of a roll as a guide in such a mill was fully disclosed in the prior art. Keeney & Ferm No. 1,918,968; Steckel No. 1,977,214. In any event at this stage of the art it was an obvious expedient to introduce such a roll where it was found to be needed. We conclude that the district court erred in holding claims 6, 18 and 19 of Patent No. 2,072,122 valid.
 
 
 15
 Little need be said with respect to the alleged infringement of these claims. Prior to November 20, 1951 Crucible admittedly used the double lift feature of the claims with respect to the pinch rolls of its mill. But by that date it had completed the removal of the additional short stroke cylinders from those rolls and had installed wholly separate guide rolls on each side of the mill. These guide rolls undoubtedly performed the guiding functions which the upper pinch rolls in low lift position had theretofore performed in the Crucible mill. But, as we have seen, the performance of these functions by a guide roll such as Crucible installed was disclosed by the prior art while the performance of those functions by the pinch rolls was not taught by the patent, indeed was excluded by its teachings. And the apparatus actually disclosed in these claims of the patent, means for raising the pinch rolls through a short distance and independent means for raising them through a greater distance, was not used by Crucible after November 19, 1951. We conclude that the district court erred in holding that claims 6, 18 and 19 of Patent No. 2,072,122 were infringed by Crucible.
 
 
 16
 We turn then to the only other claim of Montgomery Patent No. 2,072,122 which is in suit, claim 10. This relates to the adjustable side guides on each side of the mill whose function is to guide the strip from the coiler to the mill rolls on the entering side of the mill and from the mill rolls to the coiler on the other side. Steckel No. 1,977,214 had taught that the guides should be positioned close to the sides of the strip on the entering side and should be farther apart on the other side. Their position was to be changed each time the direction of the strip through the mill was reversed. Montgomery taught that the guides should be adjusted on the delivery side of the mill so as not to be parallel but to form a tapered guiding throat and several of his claims are directed to this tapered feature. But since it was not followed by Crucible these claims are not here involved.
 
 
 17
 Claim 10[3] is directed to the combination of a mill with a driving motor and a controller for the motor which also operates the means for shifting the adjustable side guides inwardly on the entrance side and outwardly on the exit side of the mill. The invention claimed is in the use of the single controller for the two purposes so that the position of the side guides will be automatically reversed when the direction of the mill is reversed. We cannot find invention in this combination. When it is desired to have two things happen simultaneously which are actuated electrically nothing is more obvious than to control them by the same switch. Claim 10 calls for no more than this. For Montgomery did not claim to invent the controller means or the idea that the guides should be adjusted each time the mill was reversed. The district court accordingly erred in holding claim 10 to be valid.
 
 
 18
 Nor do we think that the district court was right in holding that claim 10 was infringed. In the Crucible mill the teaching of claim 10 was originally followed. But in the summer of 1950 a new arrangement was made under which the side guides were caused to change their respective positions each time the mill motor circuit was opened to cause the mill to stop, the change in position being wholly independent of the direction in which the mill had been running or the direction in which it would next run. Whenever the mill stopped, whether by moving the motor controller to the off position, by pushing the independent stop button with which the Crucible mill was also equipped or by the opening of the circuit breaker on overload, the side guides changed position. Thus it was the opening of the mill circuit from any cause, and not necessarily the movement of the motor controller, which caused the guides to change position. And even when the change of the side guides was actuated by the mill motor controller it was the action of the controller in stopping the mill which effected the change not its action in starting the mill in the opposite direction. We are satisfied that this changed procedure of the Crucible mill did not infringe claim 10 of Patent No. 2,072,122.
 
 
 19
 We consider next Montgomery Patent No. 2,087,065. This is a patent on a method of rolling metal strip in which the heated slab is first rolled sufficiently thin in a roughing mill for coiling and then in the same heat is fed to a reversing mill where it is subjected to successive passes to reduce it to the desired thinness, coiling it between passes in the reversing mill. All five claims of the patent are involved.[4] Claim 1 is the broadest and the other four do not disclose any inventive differences over it. The district court did not err in holding this patent invalid as being completely anticipated by the prior art.[5] The record established that it was usual to have a roughing mill operating in line with a continuous finishing mill and there is no difference in principle in using a roughing mill in conjunction with a reversing finishing mill as distinguished from a continuous finishing mill. Indeed that very combination is suggested in Keeney & Ferm and Steckel No. 1,977,214. And in the prior patent to Cushwa, No. 904,605, the conduct of such a continuous operation in the same heat is fully disclosed.
 
 
 20
 The last of the patents to be considered is Montgomery No. 2,214,107. Two claims of this patent are in issue, claims 4 and 6, which relate to methods of operating a reversing hot mill designed to permit the strip to be tensioned uniformly between the mill and the coiler. The district court held both claims to be invalid. Its holding of invalidity as to claim 4 is not seriously questioned in this court. We will, therefore, confine our consideration to claim 6[6] which describes the process, after the breakdown has passed through the rolls of a reversing mill, of feeding its end back into the mill rolls by frictionally gripping it with the pinch rolls and after it is engaged by the mill rolls freeing the part of the breakdown between the mill rolls and the point of coiling and tensioning that part uniformly throughout.
 
 
 21
 The district court was right in holding that claim 6 is invalid. Uniformly tensioning the strip between the mill rolls and the coiler is disclosed in Steckel No. 1,857,670. Tension on the strip is also employed in Keeney & Ferm and Steckel No. 1,977,214. In the latter two patents pinch rolls are interposed between the mill rolls and the coilers. In Keeney & Ferm these are so arranged as to maintain a continuous frictional grip upon the strip. But in Steckel provision is made for lifting the upper pinch rolls off the strip. Thus all of the steps of claim 6 are disclosed in the prior art. It was an obvious expedient to lift the gripping pinch roll off the strip after its engagement by the mill rolls in order to achieve the uniform tension in the strip which Steckel No. 1,977,214 had taught was needed to prevent cambering. To lift the retractible upper pinch rolls off the strip during times when their use was found to be unnecessary or detrimental to the operation was not invention.
 
 
 22
 It remains to consider Crucible's contention that the district court erred in holding that it was required to pay royalties under the license agreement for the period during which that agreement was in force after November 19, 1951. Such payment was required under the terms of the agreement if Crucible's mill or its operation was covered by one or more claims of the licensed patents. By November 19, 1951 the basic patents, Steckel No. 1,857,670, Keeney & Ferm No. 1,918,968 and Steckel No. 1,977,214 had all expired. But Cold Metal contends that the claims in suit of the three improvement patents involved in this case all covered Crucible's mill or its operation as it existed and was operated after the changes made on and prior to November 19, 1951. If any one or more of these does so Crucible concedes that it is required to pay royalty under the agreement. But it vigorously urges that none of the claims in suit covers its mills or operations. We turn then to consider this question.
 
 
 23
 So far as concerns the claims in suit of Montgomery Patent No. 2,072,122 our conclusion that these claims were not infringed because Crucible's mill and operations were not within their proper scope after the termination of the license agreement on April 1, 1953 is dispositive of the present question. For if the Crucible mill and operation did not infringe those claims the same mill and operation could not make Crucible liable to pay royalty under the license agreement by reason of the use of the patented invention. The issues in both situations are essentially the same. Hewitt v. American Telephone & Telegraph Co., D.C.N.Y.1920, 272, F. 194, affirmed, 2 Cir., 1921, 272 F. 392; Cold Metal Process Co. v. United Engineering & Foundry Co., 3 Cir., 1956, 235 F.2d 224, 229.
 
 
 24
 Montgomery Patent No. 2,087,065 claims, as we have seen, a process involving a combination of a roughing mill and a reversing finishing mill in which the strip is passed from the roughing mill to the reversing mill in the same heat and then passed back and forth in the latter mill with coiling of the strip between the passes. Although the patent was invalid Crucible must pay royalty under the agreement if its mill operation is covered by the claims of the patent. Nonetheless it is entitled to have the claims considered in the light of and their scope restricted by the prior art. Considered in that light the claims of this patent must be restricted for the present purpose to their exact disclosures. One of these is that the strip is coiled between every pass in the reversing mill. Indeed in this case Cold Metal is limited by file wrapper estoppel to that precise method in which the strip is coiled after every pass through the reversing mill and is never passed through that mill flat. Crucible, however, did not practice this precise process during the significant period. On the contrary it always passed the strip twice through the finishing mill flat before introducing it into one of the furnace coilers. Its operation was accordingly not covered by the claims of this patent.
 
 
 25
 Finally we consider claim 6 of Montgomery Patent No. 2,214,107,[7] which calls for a method of lifting the upper pinch rolls off the strip after it has been engaged by the mill rolls so as to provide uniform tension in the strip between the mill and the coiler. We are satisfied that Crucible did not in its mill operation follow the procedure of this claim but rather that of the prior art. For it interposed upon the strip the guide or hold-down roll which it installed when it removed from its mill the low lift pinch roll feature of Montgomery No. 2,072,122. And it also interposed upon the strip a guide roll at the furnace entrance. It was a part of the teaching of claim 4 of this patent, although not of claim 6, that a guide roll should be driven "to prevent frictional drag on the breakdown". Since Crucible's rolls are undriven they necessarily exert some frictional drag upon the strip. As a consequence the strip in the Crucible mill is not uniformly tensioned between the mill rolls and the coiler as claim 6 teaches. It thus appears that Crucible did not practice the only novel feature of claim 6 of Patent No. 2,214,107.
 
 
 26
 To summarize our conclusions, the district court rightly held that the claims in issue of Montgomery Patents Nos. 2,087,065 and 2,214,107 are invalid, but the court erred in holding the claims in issue of Montgomery Patent No. 2,072,122 valid and infringed, in holding that the claims in issue of Patents Nos. 2,087,065 and 2,214,107 covered Crucible's modified mill and operations, and in awarding royalties for the period from November 20, 1951 to April 1, 1953, and damages for infringement of Patent No. 2,072,122 after that date.
 
 
 27
 Paragraphs 2, 5, 6, 7, 8, 9, and 10 of the judgment of the district court are involved in the appeals now before this court. Paragraphs 2, 5, 6 and 9 will be reversed, paragraph 10 will be vacated, paragraphs 7 and 8 will be affirmed and the cause will be remanded to the district court with directions to incorporate in the judgment a paragraph adjudging that claims 6, 10, 18, and 19 of U. S. Letters Patent No. 2,072,122 are invalid and an appropriate paragraph as to costs. Costs will be allowed to the defendant on each appeal.
 
 
 
 Notes:
 
 
 [1]
 Certain claims of the Keeney & Ferm Patent No. 1,918,968 and the Steckel Patent No. 1,977,214 have been held invalid in Cold Metal Products Co. v. Newport Steel Corp., 6 Cir., 1955, 226 F.2d 19
 
 
 [2]
 "6. In a rolling mill including a pair of housings and work rolls journaled therein, pinch rolls on one side of the mill, and means for raising one of the pinch rolls through a short distance, and independent means for raising the upper pinch rolls through a greater distance
 "18. In a rolling mill, a pair of housings having work rolls journaled therein, pinch rolls on at least one side of the mill for engaging material being worked in the mill, means for retracting one of said pinch rolls when unused for a substantial period, and independent means for temporarily retracting one of said rolls.
 "19. The combination with a rolling mill and a roll table for advancing work thereto, of pinch rolls on one side of the mill, one of said pinch rolls being retractible, and means for retracting said roll including fluid pressure-operated cylinders and pistons, one of which has a short stroke for temporarily retracting the roll and the other having a longer stroke for retracting the roll when unused for substantial periods."
 
 
 [3]
 "10. The combination with a rolling mill having a driving motor and a controller for the motor, of adjustable side guides on both sides of the mill, and means operated by said controller for shifting the guides inwardly on the entrance side of the mill and outwardly on the exit side of the mill."
 
 
 [4]
 "1. In a method of rolling metal strip, the steps consisting in supplying to a roughing mill a heated slab-like body which is too thick for coiling, rolling the body in the roughing mill until it is substantially thin enough to permit of coiling, but maintaining the thinned body in the flat state, and, in the same heat, feeding the thinned body to a reversing mill, subjecting it to successive passes therein to reduce it to a desired strip thickness, and coiling it between passes in the reversing mill
 "2. In a method of rolling metal strip, the steps consisting in supplying to a roughing mill a heated slab-like body which is too thick for coiling, rolling the body in the roughing mill until it is substantially thin enough to permit of coiling but maintaining the thinned body in the flat state, trueing the edges in said mill, and, in the same heat, feeding the thinned body to a reversing mill, subjecting it to successive passes therein to reduce it to a desired strip thickness, and coiling it between passes in the reversing mill.
 "3. In a method of rolling metal strip, the steps consisting in supplying to a roughing mill a heated slab-like body which is too thick for coiling, rolling the body back and forth in the roughing mill until it is substantially thin enough to permit of coiling, but maintaining the thinned body in the flat state, and, in the same heat, feeding the thinned body to a reversing mill, subjecting it to successive passes therein to reduce it to a desired strip thickness, and coiling it between passes in the reversing mill.
 "4. In a method of rolling metal strip, the steps consisting in supplying to a roughing mill a heated slab-like body which is too thick for coiling, rolling the body in the roughing mill until the body cools to a temperature below that at which free scale forms, and until it is substantially thin enough to permit of coiling, but maintaining the thinned body in the flat state, and, in the same heat, feeding the thinned body to a reversing mill, subjecting it to successive passes therein to reduce it to a desired strip thickness, and coiling it between passes in the reversing mill.
 "5. In a method of rolling metal strip, the steps consisting in supplying to a roughing mill a heated slab-like body which is too thick for coiling, rolling the body in the roughing mill until it is substantially thin enough to permit of coiling, but maintaining the thinned body in the flat state, and, in the same heat, feeding the thinned body to a reversing mill after cropping at least one end of the thinned body to facilitate its entry into said reversing mill, subjecting it to successive passes therein to reduce it to a desired strip thickness, and coiling it between passes in the reversing mill."
 
 
 [5]
 This patent has been held invalid by the Court of Appeals for the Sixth Circuit in Cold Metal Products Co. v. Newport Steel Co., 1955, 226 F.2d 19
 
 
 [6]
 "6. In a method of rolling strip, the steps, including passing a breakdown, heated to plastic condition, back and forth between reducing rolls, uncoiling it on one side and coiling it on the opposite side of the rolls, passing an end of the breakdown entirely through the rolls, frictionally gripping said end to feed it back through the rolls, freeing that portion of the breakdown between the mill and the point of coiling, and tensioning such portion uniformly throughout."
 
 
 [7]
 Cold Metal does not contend that Crucible's operation is covered by claim 4 of this patent